## PARR & AL.

### v.

### SAUNDERS.

(*Supreme Court of Appeals of Virginia, August 5, 1880.*)

[11 S. E. Rep. 979.]

**Fraudulent Conveyances—Case at Bar.***

A father, having debts amounting to $20,000, and property not exceeding $17,000, conveyed to his son R. two pieces of land, the price recited being $10,000. A month later he conveyed to his son W., in trust for his creditors, all his personal property, amounting to $1,300, reserving, however, control and the right to use it for five years, without accounting to any one. Two weeks later, he caused certain land which he had bought, but of which he had never taken a conveyance, to be conveyed to his son W. The land was worth $4,000, but the consideration on which the conveyance was made was that W. should pay the $850 purchase money still due thereon, and give to his father his services as a physician. Soon thereafter judgments were rendered against the father amounting to $10,000. Prior to the conveyance to R., the father had given his note of $10,000 to one G., in settlement of the latter's claims for services rendered as a clerk. The consideration of the conveyance to R. was that he should assume and pay this. In fact R. paid but a few hundred dollars of it, and G., who lived part of the time with R. and part of the time with the father, never pressed the claim,—in fact, took in place thereof R.'s note for a small amount, and his promise to do certain things. Moreover, it appeared that neither R. nor his father expected that they would have to pay G. much of anything. Thereafter R., shortly before going into bankruptcy, conveyed the land to W. The father continued in possession of the premises until his death: *held*, that the transactions were voluntary, and in fraud of the father's creditors.

*See monographic note on "Fraudulent and Voluntary Conveyances," Va. Rep. Anno.

**Same—Rights and Liabilities of Grantee—Case at Bar.**

The vendor of the land which was conveyed to W. having a pur-
chase-money lien thereon for $850, W. was entitled to be reimbursed
for such part thereof as he paid after his father's creditors brought
suit for the land.

**Same—Suit to Set Aside—Rights and Liabilities of Grantee.**

In a suit by creditors to set aside a fraudulent conveyance, the
grantee can be held liable for rents and profits prior to the time of
the decree against him, where the creditors had already obtained
judgments against the debtor.

Appeal from circuit court, Essex county.

*Jones & Bouldin,* for appellants.

*John A. Meredith,* for appellee.

STAPLES, J., delivered the opinion of the court.

The appellants filed their bill in the circuit court of Essex
county, for the purpose of setting aside, as fraudulent, cer-
tain deeds executed by John Saunders to his sons, Robert and
Walton Saunders.   The circuit court was of opinion the
deed of trust executed to Walton Saunders the 12th of Feb-
ruary, 1866, was fraudulent and void as to creditors, and so
declared in its decree of the 26th of April, 1867.   No com-
plaint is made of that decree by either of the parties, and it
will not be further considered.   The circuit court was,
however, further of opinion that the plaintiffs (the appellants
and other creditors of John Saunders) had failed to make
out a case of fraud in the two deeds executed by John Saun-
ders to Robert Saunders the 4th of January, 1866, and
accordingly, at the July term, 1876, the court entered a
decree dismissing so much of the bill, original and amended,
as related to these deeds.   The court was further of opinion
that the property known as "Mount Nebo" is liable to the
creditors of John Saunders to the extent of the purchase
money paid by him, and to Walton Saunders for the amount

paid by him; and an order was entered for the purpose of ascertaining the sums respectively paid by said parties. From that decree the appeal in this case was taken, and to it our inquiries must be directed.

The first question to be considered is whether the deeds to Robert Saunders are fraudulent and void as to creditors. In order properly to decide this question, we must look at the indebtedness of John Saunders at the time; the value of his estate, real and personal; the disposition made by him of that estate; and the circumstances attending and following the execution of the deeds themselves. It appears then that in January, 1866, John Saunders' indebtedness amounted to about $23,000, exclusive of the debt claimed to be due Mortimer Gravatt, hereafter to be more particularly mentioned. His property, real and personal, did not exceed the value of $17,000; so that in fact he was then actually insolvent. If he had not then been sued he certainly was very soon afterwards; for it appears that judgments were rendered against him at the April term, 1866, to the amount of $10,000. In this condition of things, John Saunders executed to his son Robert, then residing in the state of Alabama, the two deeds already referred to,—the one conveying an estate known as "Wheatland," containing 447 acres, at the price of $9,000; the other conveying "Loretto," the family residence, containing 4 acres, a dwelling-house, store-house, and other outbuildings, at the price of $1,000. By deed bearing date the 6th of February, 1866, John Saunders conveyed in trust to his son Walton Saunders, for the benefit of his creditors, his entire personal estate, of the value of about 13 or 14 hundred dollars, reserving, however, in the deed complete control of the property, with the right to hold, use, and enjoy the same for the space of five years, without accountability to any one. It further appears that John Saunders had purchased of William L. Waring a tract of land known as "Mount Nebo,"

at the price of $3,993.75, and that he had paid all the purchase money except about $850 ; but he had received no conveyance.  On the 15th of February, 1866, he caused this tract to be conveyed to his son Walton Saunders, upon the consideration, as stated in the answer of Walton Saunders, that he would pay the balance of the purchase money, amounting to $850, and also settle and reside near his father, practice there his profession as a physician, and give the latter his counsel and assistance in his declining years.  It will thus be seen that John Saunders, in the short space of a month or two, and obviously in anticipation of the judgments about to be rendered against him, had divested himself of his entire estate, the greater portion of it, and by far the most valuable, being conveyed to his two sons.  The only part of it dedicated to his creditors was of little value compared with the other, and is accompanied with reservations which enable the grantor to consume the whole of it before the rights of creditors attach. The transaction speaks for itself.  Every impartial mind will at once declare the presumption of fraud to be almost irresistible, and only to be repelled by the strongest and most persuasive evidence.

Let us next inquire into the facts relied upon to sustain these conveyances.  It seems that John Saunders, for many years prior to the war, was a merchant in Essex county, and that Mortimer Gravatt was his clerk, doing business upon an agreed salary of from two to five hundred dollars, a very small portion of which had ever been paid.  In April, 1865, Saunders and Gravatt had a settlement, which showed a balance of $9,859.04 due Gravatt, for which amount Saunders executed his bond to Gravatt.  In November, 1865, it was agreed between John Saunders and Robert Saunders that the latter should become the purchaser of the two estates of his father known as "Wheatland" and "Loretto," at the price of $10,000 ; and, in consideration thereof,

Robert Saunders was to assume the payment of the debt due Gravatt, which was about sufficient to absorb the whole amount of the purchase money of the two estates. In accordance with this understanding, Robert Saunders entered into an arrangement with Gravatt by which he assumed the payment of and became the owner of the bond held by Gravatt upon John Saunders. It is insisted that all this was done in the utmost good faith ; that, in the absence of any bankrupt law, John Saunders had the right to prefer any one of his creditors, and, as Gravatt had been for many years a member of his family,—a clerk who had rendered long and meritorious services,—it was but just and proper he should make some arrangement to secure him. This is the position of the appellee, the correctness of which may be conceded, provided the *bona fides* of the transaction is established. The facts already stated show that the purpose of John Saunders, in anticipation of the judgments to be rendered against him, was to place his entire estate beyond the reach of his creditors. That Robert Saunders had notice of his intentions will be made clear in the course of this opinion. The correspondence of the parties shows that neither John nor Robert Saunders ever for a moment entertained the idea of paying Gravatt the full amount of his debt. Both of them thought, and indeed so declared, he would be easily satisfied, and the result proved they were correct in their calculations. That debt, however, to its full amount, was to be used for the purpose of screening the property from the demands of northern creditors. It appears that in November, 1866, Gravatt assigned the bond to Robert Saunders. At that time it amounted to something over $11,000. In consideration of the assignment, Robert Saunders executed his bond to Gravatt for $3,000, with three years' interest deducted ; and he further agreed to furnish Gravatt, as soon as practicable, a store-house or place of business, and, as soon as the store-house or place of

business was provided, then he was to furnish a sufficient cash capital to carry on a substantial mercantile trade. Who was to have the privilege of determining when it was practicable to furnish the store-house or place of business, and where it was to be located, whether in Virginia or Alabama, does not appear. And we are equally in the dark as to what then constituted "a sufficient cash capital to carry on a substantial mercantile trade," or which of the parties was to decide that question. That a *bona fide* creditor would surrender a debt of $11,000, the product of a life of labor, upon a vague and uncertain undertaking of this sort by his debtor, seems almost incredible. After all this, we are not surprised to learn that Robert Saunders never furnished the store-house or place of business, nor the cash capital; and all that he ever paid upon his bond of $3,000 was the sum of $500. It does not appear that Gravatt ever even demanded the fulfillment of these obligations. He went to Alabama and lived with Robert Saunders a year. He then returned to Virginia, and has resided here ever since with the family of John Saunders. In May, 1868, Robert Saunders went into bankruptcy. A few months before doing so, however, he conveyed both Wheatland and Loretto to his brother, Walton Saunders, at the nominal price of $12,000, the payment of which was acknowledged on the face of the deed. In his schedule in bankruptcy he did not allude to this sale. He surrendered neither houses nor money. He did not even include Mortimer Gravatt in his list of creditors. As Robert Saunders resided in Alabama, and his principal indebtedness was contracted in that state, it is very probable his creditors were never informed of these transactions, or of the pretended purchase by which he became the owner of the estate in Virginia. Mortimer Gravatt, however, knew of the bankruptcy, and of the death of Robert Saunders, of the conveyances to Walton Saunders, and yet, down to

the time of trial of this cause, in November, 1874, it does not appear he had concerned himself in any manner about his debt, or that he had made the slightest effort to secure the fulfillment of Robert Saunders' contract with him. It is very possible that Gravatt may have had some claim against John Saunders for services rendered. He was an intimate friend of the family, strongly attached to both father and sons. He himself had no family, and probably cared but little about enforcing the collection of his debt. He was, however, very willing to enter into any arrangement by which John Saunders' property might be secured to him against the claims of his northern creditors, and he was content that Saunders' debt to him should be the means by which that object was effected. If anything was actually due him, he no doubt relied upon the generosity as well as gratitude of the family to repay him at some future period. The result proved that both John and Robert Saunders were correct in supposing that he would be easily satisfied. What has been the result of this family arrangement? John Saunders, the debtor, continued in the possession and enjoyment of his estate to the day of his death. Since that time, his son Walton Saunders has been in possession as owner without paying one dollar to anybody, except, indeed, the small amount he may have paid to Waring in discharge of his lien as vendor on Mount Nebo. Not one of the numerous creditors of John Saunders has been paid, and, if Gravatt is to be considered a *bona fide* creditor, he has received only $500 upon his large debt of more than $10,000. If a transaction of this sort can stand the ordeal of a court of equity, the principles of the common law, and the statutes prohibiting fraud, are a delusion and a mockery.

The learned counsel for the appellee has, however, laid much stress upon the fact that his clients were called upon for a discovery, and, having made that discovery, in response

to the bills, their answer must be taken as true until over-thrown by the testimony of two witnesses, or one witness with corroborating circumstances ; and no such testimony has been furnished in this case showing the existence of fraud in these transactions. It is all-sufficient to say, in reply to this view, that an answer may be overthrown as well by circumstances as by the direct testimony of witnesses. A transaction may, of itself, and by itself, furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendants, and even the evidence of witnesses. The circumstances attending and following a transaction are often of such a character as to leave not even a shadow of doubt as to the real object and motive of the parties engaged in it. And where that is the case, as the one before us, it is rash to attempt to claim any advantage from an answer because it is responsive to the bill. Experience attests that in a majority of cases fraud can only be established by cir-cumstances. The motives and intentions of the parties can only be judged of by their actions, and the nature and char-acter of the transaction in which they are engaged. These often furnish more conclusive evidence than the most direct testimony. Let it be conceded, however, that Gravatt's debt was a just one. Still, if he permitted it to be used for the purpose of protecting his debtor's property against the claims of creditors, the transaction is fraudulent and void. If a creditor be privy to a fraudulent intent on the part of his debtor, and take a deed to secure his own debt, with pro-visions to hinder and delay other creditors, the deed will be void, although his only motive was to secure his own debt, and the other provisions were forced upon him by the debtor as the only means of having his own debt secured. Garland v. Rives, 4 Rand. (Va.) 282 ; Henderson v. Hunton, 26 Gratt. 933, 934, and cases there cited. It must be further borne in mind that Gravatt is not before the court asserting any claim to the payment of his debt. The only person

claiming title to the property, and controverting the right of the appellee, is Walton Saunders, who confessedly has never paid one dollar to anybody, unless, indeed, he has made payment to Waring in discharge of the vendor's lien. I say confessedly, because it is not pretended he ever paid Robert Saunders the purchase money for Wheatland and Loretto. If he has, it devolved upon him to show it. It was easy for him to produce his receipts and vouchers showing the fact. He filed his deed as evidence without a word of explanation. Besides, the fact was notorious that Walton Saunders has been throughout utterly insolvent. Without protracting this discussion further, I think the two deeds executed by John Saunders to Robert T. Saunders, and the deed from Robert T. Saunders to Walton Saunders, were fraudulent and void, and the transaction or arrangement between John Saunders and Walton Saunders, by which Mount Nebo was conveyed to Walton Saunders, was also fraudulent and void, and the circuit court erred in not so holding.

The further question to be considered is whether Walton Saunders is entitled to a lien upon Mount Nebo for any payments he may have made in discharge of the vendor's lien, in pursuance of the arrangement between him and his father, John Saunders. The rule settled by the courts is that, where the conveyance is actually fraudulent, it is not permitted as security for any purpose. It is impossible that a deed can be permitted to stand as security if it is to be adjudged void *ab initio*. In Sands v. Codwise, 4 Johns. 597, Kent, C. J., said he presumed there is no instance to be met with of any reimbursement of indemnity afforded by a court of chancery to a *particeps criminis* in a case of positive fraud. A different rule prevails, however, where the deed is obtained under suspicious circumstances, or which is only constructively fraudulent. In this latter class of cases, the deed is permitted to stand as security for the purpose of reimbursement or indemnity. In Boyd v. Dunlap, 1 Johns.

Ch. 482, Chancellor Kent said nothing could be more equitable than this mode of dealing with those conveyances of such indecisive and dubious aspect that they cannot be entirely suppressed or entirely supported with satisfaction and safety.  See Henderson v. Hunton, 26 Gratt. 935, where this question is a good deal discussed, and the authorities cited.  There is no doubt, as already stated, the arrangement between John and Walton Saunders, by which Mount Nebo was conveyed to the latter, was a part and parcel of the scheme set on foot to protect the property of John Saunders against the claims of creditors, and was therefore fraudulent and void.  And yet it is by no means clear that the case is within the influence of the rule already adverted to.  Walton Saunders assumed payment of the unpaid purchase money, not to John Saunders, but to Waring, the vendor, and became individually bound to him.  The payments made by Walton Saunders were made to Waring, whose lien was primary and absolute,—a lien which bound the property in preference to all other claims.  Conceding, therefore, the existence of fraud, I cannot see why Walton Saunders should be denied the benefit of the vendor's lien. I am not entirely satisfied with the distinction here made, and yet it seems to me the case stands upon a different ground from that of a debtor who conveys to a *particeps*, and which, being void, is not a security for any purpose.  In this case there is no fraudulent conveyance.  The money paid is not to the fraudulent debtor, but to a third person, whose lien was undisputed and paramount, and, if not so paid, could have been enforced against the land.  Besides, whatever amount may have been paid by Walton Saunders must have been paid when this bill was filed, in 1866.  The creditors, having asserted a claim to the property, and having by their suit placed it under the jurisdiction of the court, must recognize all the payments as made for their benefit, and in discharge of a lien upon it paramount to their claims.  I think,

therefore, the account directed by the circuit court should be
limited to such payments as were made by Walton Saunders
after the institution of this suit.    With this restriction, I
see no objection to the account.    What has been said in this
connection is based on the assumption that Waring retained
a vendor's lien on the land, to which Walton Saunders' can
be substituted.    This point can be determined by the circuit
court by reference to Waring's deed, which is not in the
record.

The next question is as to the liability of Walton Saun-
ders for rents and profits of the lands received by him, or
which might have been received, while he has been in pos-
session.    His counsel insists that he cannot be held so liable,
except from the time of the decree which may be rendered
against him.    Until such decree, he is entitled to the pos-
session of the lands under the deeds from John Saunders.
They rely upon the case of Blow v. Maynard, 2 Leigh 29,
in which it was held that where the debtor makes a convey-
ance of real estate to the use of his children, upon a bill by
a creditor after debtor's death against grantee's children,
who claim under the deed, and the conveyance is declared
voluntary and fraudulent, the grantees are not accountable
for rents and profits prior to the decree.    This decision
was placed mainly upon the ground that the heir is entitled
to the possession of the lands descended until there is a
judgment or decree, and, until the creditor obtains such
judgment or decree, he is not entitled to claim rents and
profits.    It was conceded in that case by the judges that if
there had been a judgment against the ancestor in his life-
time, the fraudulent donee, whether a stranger or the heir,
would be liable for the rents and profits enjoyed by him, and
lost to the creditor by reason of the fraud.    This court, in
the more recent case of Elder v. Harris, went further, and
decided that in cases of actual fraud the creditor is entitled
to a decree for rents and profits, although he may have no

judgment. The reason is that it would be the rankest injustice to allow the fraudulent grantee to throw any impediment in the way of the creditor to hinder and delay him in the collection of his debt by any possible device, and, in the meantime, to appropriate to his own use the rents and profits, and at last, after years of expensive litigation, to turn the creditor over to a tract of land impaired in value, and worn out by injudicious cultivation. Such a doctrine is but an invitation to protracted litigation and a premium for fraud. Elder v. Harris is not reported, and none of us can speak with absolute confidence as to the period fixed for the commencement of the account of rents and profits. It was, however, anterior to the filing of the bill, probably the date of the fraudulent alienation. The decision is fully sustained by the case of Com. v. Ricks, 1 Gratt. 416, and by numerous cases in other states, cited in 4 Minor's Inst. marg. p. 1137, and in Bump, Fraud. Conv. (3d Ed.) 612. Without undertaking now to say whether the rule adopted in Elder v. Harris will be universal, or generally followed by this court, it is not necessary to rely upon it in the present case, for it appears that judgments were rendered against John Saunders in his lifetime to the amount of $10,000, as far back as the year 1866. The bill was filed also in the same year, and, under the decision of this court, the creditor so filing his bill to impeach a conveyance for fraud acquires thereby a lien upon the property fraudulently alienated. The year 1866 might, therefore, consistently with the soundest principles, be adopted as the beginning of the account of rents and profits. It appears, however, that, with the exception of the Mount Nebo property, Walton Saunders did not become the owner, or pretended owner, of any of the lands until January, 1868, when the deed was executed to him for Wheatland and Loretto by Robert Saunders. Walton Saunders cannot, therefore, be charged with rents and profits except from that year. He certainly ought to be

held liable from that time, because he has held these lands ever since, without having paid one cent for them to anybody. He assumed ownership when he knew the title under which he claimed was fraudulent, and a suit was pending assailing it on that ground. The rent of the Mount Nebo property is a matter of very little importance, I imagine, and the year 1868 may be adopted, as proposed, for commencing that account also. For the reasons stated, my opinion is the decree of the circuit court is erroneous, and must be reversed, and a decree entered here in conformity with the views expressed.