# Wytheville.

## Todd v. Sykes.

### June 15, 1899.

1. FRAUD—*Undue Influence—Burden of Proof—Indicia of Fraud—Presumption.*—In a suit to set aside a deed on the ground of fraud and undue influence, the burden of proof is, as a rule, on the plaintiff to prove the fraud and undue influence alleged, and such proof must be clear and convincing. But if *indicia* of fraud are proved, so that the fraud may be presumed from the circumstances and condition of the parties, or their intimate and confidential relations one to the other, as parent and child, or in any other way, the burden of proof shifts to the defendant, and he is obliged to repel the presumption of fraud and undue influence arising from the circumstances of the transaction and the relation of the parties by strong and clear evidence.

2. FRAUD—*Prima Facie Case—Relationship of Parties—Burden of Proof.*—If the relationship of the parties and the surrounding circumstances cast doubt upon the payment of the consideration for a conveyance, the burden of proving such payment and of showing good faith in the transaction is on the grantee.

3. FRAUD—*How Established.*—Fraud may be established by circumstantial evidence as well as by direct and positive proof, and in most cases circumstantial evidence is the only proof that can be adduced. A transaction, however, may of itself and by itself furnish proof of fraud so conclusive as to outweigh the answer of the defendant, and even the evidence of witnesses.

4. FRAUD—*Indicia—Relationship of Parties—Case in Judgment—Burden of Proof.*—False admission of receipt of consideration, absence of means in the grantee, failure on the part of the grantee to produce evidence supposed to be within his reach, unusual mode of payment, and want of clear proof are among the *indicia* of fraud. Mere relationship of the parties is not alone a badge of fraud, but it strengthens a presumption arising from other circumstances, and

calls for close scrutiny. In the case in judgment the evidence raised a presumption of fraud and undue influence against the defendant, and shifted the burden of proof upon him to establish the good faith and honesty of the transactions assailed by clear and strong proof. This he failed to do.

5. APPEAL AND ERROR—*Record—Opinion of Trial Judge.*—If the opinion of the trial judge is referred to in the decree deciding the cause as setting forth the reasons for his decision, it becomes a part of the record, and it is proper to copy it as a part of the record certified to the appellate court.

Appeal from the Law and Chancery Court of the city of Norfolk pronounced June 1, 1897, in a suit in chancery wherein the appellee was the complainant, and the appellant was the defendant.

*Affirmed.*

The opinion states the case.

*Drury A. Hinton,* for the appellant.

*Burroughs & Bro.,* for the appellee.

CARDWELL, J., delivered the opinion of the court.

This is an appeal by Charles H. Todd from a decree of the Law and Chancery Court of the city of Norfolk setting aside as fradulent and void eight deeds made by Lucinda Todd to her son, the appellant, conveying to him the entire real estate owned by her. The deeds were attacked by appellee, Josephine Sykes, a half sister of appellant and a daughter of Lucinda Todd by a former marriage, and the grounds upon which the attack was made were that the deeds were without consideration, and were obtained by the grantee by fraud, deceit and undue influence. Three of the deeds are dated April 30, 1895, were acknowledged June 5 of the same year, and admitted to record July 20, 1895. The other five bear date and were acknowledged July 16, 1895. Four of them were admitted to record July 20, 1895; and the other July 23, 1895.

Of the three deeds of April 30, 1895, one conveys a lot on Chapel Lane, in the city of Norfolk, in consideration of $1,200; one conveys lots numbered 61, 63 and 67 on Avenue B in Huntersville, Norfolk county, in consideration of $750; and the third conveys lots 26, 28 and 34 on the same avenue in consideration of $750; the total consideration named in these three deeds being $2,700.

The five deeds dated July 16, 1895, convey various pieces of land therein described, for an aggregate consideration of $5,580.

The appellant, Chas. H. Todd, the defendant in the court below, filed his answer denying under oath the various allegations of fraud made in the bill, and alleging that he paid his mother in cash for all of this property except the Chapel Lane lot, which he alleges was originally paid for with his money at the time it was conveyed to his mother, he being the real purchaser thereof, and except that lots Nos. 61, 63 and 67 on avenue B in Huntersville were originally purchased by and conveyed to him, and were subsequently conveyed by him without consideration to his mother, he not wishing to hold them in his own name. To this answer the plaintiff in the court below replied generally.

Sixteen witnesses were examined for the plaintiff, and twenty-four for the defendant, and upon the bill and answer and numerous exhibits therewith, statements and agreements filed in the record, and on the depositions of the witnesses, the court below set aside all of the deeds on the grounds stated.

In considering this case upon its merits we may, as did the court below, leave out of consideration the various exhibits produced to prove that appellant had been removed from the office of justice of the peace of the city of Norfolk by the council of the city; that he had been indicted for selling liquor to minors, for collecting a fine and failing to return the same, and for failing to pay into court a fine imposed by him; that he was reported to the Corporation Court of the city of Norfolk by the grand

jury for selling liquor on Sunday, while a justice of the peace, and for making an agreement to divide fines with the high constable; that the Corporation Court decided that he was not a fit person to have license to keep a bar, and revoked it, and that he was found guilty of an assault upon George Scott, a witness for the plaintiff examined in this suit, made since its institution, within a few days after the examination of the witness, and his punishment fixed by a jury at a fine of $20.00 and a confinement of 30 days in jail—the only provocation given his assailant by the witness being the statement to him that he (the witness) had told the truth in his deposition.

We leave out of consideration also the declaration of Mrs. Todd proven as to force or undue influence, used by appellant in securing the conveyances of the property to him, but it is proper to consider her statements as evidence to show her state of mind and condition at the time she executed the conveyances. Waite on Fraud. Con., sec. 206 and note.

The burden of proof in this case is on the plaintiff to prove the fraud and undue influence alleged in the bill, and such proof must be clear and convincing, but if *indicia* of fraud be proved so that fraud may be presumed from the circumstances and condition of the parties contracting, or if it is proved that the parties stood in an intimate and confidential relation, one to the other, either as parent and child, or in any other way, the burden of proof shifts to the defendant, and he is obliged to repel by strong and clear evidence the presumptions of fraud and undue influence arising from the circumstances of the transaction and the relations of the parties, and in such cases he must prove the truth of the defence set up in his answer. *Fishburne* v. *Ferguson*, 84 Va. 111; *Hickman* v. *Trout*, 83 Va. 491-2; Waite on Fraud. Con., secs. 225 and 271; Bump on Fraud. Con., secs. 249, 256, and note to 67; and *Francis* v. *Cline*, 96 Va. 201.

If from the relations of the parties and the surrounding circumstances a doubt is thrown around the payment in good faith

of the consideration for the conveyance of the property, the
grantee must prove the payment of the consideration, (*Hickman*
v. *Trout, supra,*) and when transactions as in this case, between
parent and child, are attacked the burden of proving good faith
and consideration is on the relative who is grantee.    Bump
on Fraud. Con., secs. 66, 67, and cases cited in note 8.

It is not necessary to prove fraud by direct and positive evi-
dence.   Circumstantial evidence is not only sufficient, but in most
cases is the only proof that can be adduced.   *Armstrong &c.* v.
*Lachman,* 84 Va. 728; *Moore* v. *Ullman,* 80 Va. 311; *Hickman*
v. *Trout, supra; Saunders* v. *Parrish,* 86 Va. 592; *Ferguson*
v. *Daughtry,* 94 Va. 308; *Hazlewood* v. *Forrer,* 94 Va. 703;
*Francis* v. *Cline, supra.*

A transaction may of itself and by itself furnish the most
satisfactory proof of fraud, so conclusive as to outweigh the
answer of the defendant and even the evidence of witnesses.
*Jones* v. *Magruder,* 87 Va. 360, 379, and authorities cited;
*Hazlewood* v. *Forrer, supra.*

Among the *indicia* of fraud as laid down by the authorities
are false admission of receipt of consideration, absence of means
in the grantee, his failure to produce evidence supposed to be
within his reach, unusual mode of payment, want of clear proof,
etc.  Bump on Fraud. Con., sec. 66 *et seq;* secs. 42, 63, and 64
and notes; *Hickman* v. *Trout, supra.*

Relationship alone is not a badge of fraud, but calls for close
scrutiny and strengthens presumption arising from other cir-
cumstances.   Waite on Fraud. Con., sec. 242; Bump on Fraud.
Con., sec. 67; *Saunders* v. *Parrish, supra.*

We cannot undertake to review all the testimony of the
various witnesses examined in this case.   In fact it would serve
no good purpose to do so.   The evidence fully proves the follow-
ing facts: That the grantor in the deed attacked was the mother
of the defendant, the grantee, over 70 years of age; that her son,
at the time the deeds were executed, lived with her; that they

were both persons of bad temper and had frequent quarrels and altercations; that he used threats and was guilty of abusive conduct and violence towards his mother on several occasions with reference to her property, or in efforts frequently made by him to get money from her; that she had expressed herself and acted a number of times as if she was in fear and dread of him, though there is some evidence that he was at times kind and considerate of her; that he at times argued with her and tried to get others to impress upon her, that if she gave any portion of her property to her daughter, Josephine (appellee), an adopted child of Josephine, against whom he knew his mother had some prejudice, would get it, and held out to his mother the idea that he (appellant) would take care of Josephine. The evidence also shows that Mrs. Todd had often stated her intention of leaving her estate to be divided equally between her son and daughter; that she had made several wills to that effect, the last of which, known to her son, was found in her house at the time of her death, was produced by the plaintiff, and duly probated; that Mrs. Todd had a number of dealings with the Bank of Commerce in Norfolk running back ten years, but made no deposit in that bank or any other bank in the city of Norfolk from April 24, 1895, to the time of her death, except the sum of $470 which she deposited in the Bank of Commerce for the benefit of herself and daughter a short time before her death. It is further shown that no money was found in her house after her death; that defendant was a man without means to any extent, and had been assessed for taxation in 1895 with only $10 of property of every character; that an execution for $80 against him had been returned "no effects" in April, 1895, at which time he told the officer holding it that he had no property; that Mrs. Todd, for a year or so previous to the making of these deeds and to her death, had seemed to be anxious, unhappy, in dread, in an unnatural state of mind, and that finally, on the 29th day of September, 1895, she died from self-administered poison taken while she was alone

with her son (appellant) as she stated to two witnesses who saw her before her death, which occurred in a few minutes after the poison was taken.

As we have seen, the deeds in question were executed in April and July, 1895, a short time before the grantor's death in September following. They conveyed all her real estate to her son, who, as her heir and under her will, would in the course of nature have become the owner of one-half of it in a short while, without the payment of one dollar; yet in his answer he alleges that he paid her in cash for it (except the Chapel Lane lot and the three Huntersville lots). The total consideration thus alleged to have been paid was, as shown by the deeds, the sum of $6,330.

The evidence shows clearly such a state of circumstances surrounding the transaction, and such a condition and relation existing between the parties as justifies, indeed demands, the strictest scrutiny, and raises irresistibly a presumption of fraud and undue influence, and shifts the burden of proof to the defendant, requiring him to establish the good faith and honesty of the transaction by clear and strong proof. He swears in his answer to the *bona fides* of the transaction, and that he paid cash for all the property except that on Chapel Lane, and lots 61, 63 and 67 in Huntersville, which he claimed belonged to him, yet we shall presently see that his own evidence is directly in conflict with his answer, and, if it is to be believed, shows the most remarkable fact that he paid not only the aggregate consideration for all the deeds but largely in excess thereof.

In his answer he says that the Chapel Lane property was originally paid for with his money, and that he paid for examining the title. The only proof to sustain this allegation is contained in the testimony of his witness, Midgett, who says that he heard Mrs. Todd say that this lot had been bought by her with money he (her son) had given her for that purpose, and that it was on July 10, 1895, that she told him this as well as at other

times, and, furthermore, that he (Midgett) had heard the plaintiff say that this lot was defendant's. A complete answer to this statement is found in the evidence introduced by the defendant himself, which, if to be credited, shows that he paid his mother the full value for this property. He has not, however, introduced the lawyer who examined the title, nor any other evidence to prove that he paid for such examination, and, unfortunately for him, the very witness upon whom he relies proves most conclusively, if he is to be believed, that the Chapel Lane property, instead of having been conveyed to Todd by his mother without consideration, was actually bought by him from her, and that he paid her for it. This witness distinctly states that about May 1, Mrs. Todd told him she had sold her son her property, had three deeds drawn up, and that he had paid her $2,000 and owed her $700; that on June 10, 1895, witness saw defendant pay his mother $700 in money; that defendant counted ·the money and said to his mother, " Mother, there is the balance; now give me the three deeds "; that she took the money, wrapped it in rags, and put it under the bed, and then and there delivered him the three deeds. Now, the only deeds then in existence were the three dated April 30, 1895, one of which conveyed the Chapel Lane property, and the total consideration named in the three deeds was $2,700, of which, according to this witness, $2,000 had been previously paid Mrs. Todd, and the balance of $700 he saw then paid; and witness distinctly says that this $700 was paid for the balance due on these three deeds then given to defendant; and further that Mrs. Todd said on June 10, after receiving the $700, that she had agreed to sell her son all of her property for $8,280. If this is true, the Chapel Lane lot was included, for $8,280 is the total consideration of the eight deeds in question. This witness then makes the most remarkable statement to the effect that Mrs. Todd said on July 10, a month after the delivery of the three deeds, that Charles must pay her $6,700 before she gave him deeds for all her property, yet $6,700·

added to $2,700, which, according to the witness, had already been paid, would make $9,400, or $1,220 more than the total price, including the Chapel Lane property, of $8,280, and if nothing was to have been paid for the Chapel Lane property and the three Huntersville lots, as stated in the answer, only $6,330 would have been the total original consideration for all the property, and $2,700 of that having been already paid prior to July 10, only $3,630, not $6,700, would have been due Mrs. Todd.

It is perfectly clear that the testimony of this witness is wholly irreconcilable with the answer of the defendant which it directly contradicts, and, moreover, is utterly irreconcilable with itself and not worthy of belief. Moreover, defendant's answer is directly contradicted as to the Chapel Lane property by an alleged receipt of Mrs. Todd, dated April 25, 1895, introduced by the defendant, which is in his own handwriting, and states that $2,700 was the consideration for the property mentioned in the three deeds of April 30, 1895, including the Chapel Lane property. He introduces two witnesses to prove that this receipt is genuine, and that they saw him pay $2,000 on account of this very property, which in his answer he swears he never paid his mother for at all; and by one of these witnesses he seeks to prove that when he showed witness this receipt he said to witness that he had made an investment and bought property from his mother, and by his witness (Midgett) that he saw him (defendant) pay his mother $700, the balance for this very property.

What has been said about the Chapel Lane property applies equally to the three Huntersville lots for which he stated in his answer he paid his mother nothing, because they belonged to him, and, in addition, he does not even attempt to prove the allegation of his answer that these lots were originally conveyed to him, and afterwards conveyed by him to his mother without consideration; nor does he attempt to sustain the allegation of his answer that he paid for the Chapel Lane property when originally

bought, and for the manifest reason that he could not have adduced such proof, as the real estate agent from whom Mrs. Todd bought this property testifies that he sold it to her, and she paid the money.

A brief review of the testimony introduced by the defendant to show that he paid his mother the $2,700, the aggregate of the consideration for the three deeds of April 30, 1895, will show that it is not only irreconcilable with the allegations in the defendant's answer, but is unworthy of belief. As we have seen, Midgett testifies to the payment of the $700 as a balance for the property embraced in these three deeds, as to whose testimony on this point we have no occasion to comment further. The other two witnesses who attempt to show that the $2,000 was paid by defendant on account of this property are so irreconcilably in conflict with the sworn answer of the defendant and the other circumstances of this case that the conclusion that they are testifying falsely is irresistible. One of these witnesses, Hawkins, swears he saw defendant take the money from his safe, while the other, Du Pass, saw no safe. Hawkins saw defendant count the money at his desk, while Du Pass says he had a big table and counted the money on the table. Hawkins says that when he went into the office, Brownstein and Du Pass were both there, and that all three of them stood up and watched the counting, while Du Pass states that he did not see Hawkins in the office at all, and that Brownstein was not there until after the transaction was over; that when he (Du Pass) went into the office he took a chair. Hawkins says that the defendant wrote a receipt in the presence of all of them. Du Pass says the receipt was not written while he was there. Hawkins says that after the money was paid, all went out of the office, and Du Pass and Mrs. Todd engaged in a conversation, while Du Pass states that Mrs. Todd left by herself while he was still there, and that he had no talk with her, as he was not acquainted with her, and that Brownstein did not come in until after this. Brownstein is

not introduced to corroborate the statement of these two witnesses that the $2,000 was then paid. Why, does not appear.

This brings us to the consideration of the proof of the payment of the sums named in the five deeds dated July 16, 1895, which amount to $5,580. The evidence introduced by the defendant to prove this payment is the alleged receipt dated July 10, 1895, for $1,580, sought to be established as genuine by the witness Midgett, and Lavinda Clark and R. M. Quidley were introduced to prove the payment of the remaining $4,000 in cash to Mrs. Todd, and the delivery by her of the deeds to the defendant.

Midgett swears that he saw defendant make out this receipt and Mrs. Todd sign it on July 10, 1895, but that no money was then paid; therefore the only proof of the payment of $1,580 is the receipt itself, which is attacked as a forgery. Plaintiff's witness, Hare, for a long time teller of the Bank of Commerce, who knew Mrs. Todd's signature well, declares it to be a forgery, and defendant's own witness, Ferebee, called to prove its genuineness, pronounces it doubtful, and says he would not now pass or accept it as genuine. There can be no doubt that the receipt is a forgery, or that the money named therein was never paid to Mrs. Todd, for from the testimony of defendant's own witnesses, taken in connection with his answer, no such amount could have been paid. If nothing was paid for the Chapel Lane property and the three Huntersville lots, the total consideration for all the deeds, as we have seen, was only $6,330. Of this sum, according to Midgett, Du Pass, and Hawkins, $2,700 had been paid to June 10, 1895, so that only $3,630 remained unpaid, and according to witnesses Clark and Quidley, $4,000 was subsequently paid, leaving nothing due Mrs. Todd, but actually overpaying her $370, without including the $1,580, alleged to have been receipted for by Mrs. Todd on July 10, 1895. Therefore, the answer of the defendant and the evidence he adduces of the payment for the consideration of these deeds presents the anomaly that if his evidence is to be believed, his sworn answer is false,

and he has actually paid more money to his mother than he owed her for the entire property by the sum of $1,950.

Now as to the proof that the $4,000 was paid, testified to by " Lou " Clark and Quidley—although, if the other witnesses are to be believed, no such amount was due Mrs. Todd: According to the testimony of these witnesses the $4,000 was paid to Mrs. Todd at night, and at her home in Norfolk. Quidley, a man having no local habitation and often found in the city jail of Norfolk, and repeatedly before the Police Court for misconduct, is a companion of the defendant. He cannot tell the exact date at which the $4,000 was paid, but thinks it was somewhere in the latter part of July, while the deeds for the property were put on record July 16. He tells, however, with great particularity .that the defendant counted out the money in piles of $100 each, until he got ten piles, and he then put the ten piles together, making $1,000, and continued to count until he counted $4,000, and Mrs. Todd took the money and put it under the bed. " Lou " Clark (colored) could not tell whether the money was in one dollar bills or two dollar bills. She says that when she left, the money, as counted out by the defendant, was still on the table, and that Quidley left before she did. Quidley testifies that the defendant had the money wrapped up, he thinks, in a piece of paper, and a strap around it, in two bundles, while Lou Clark says the money was " loose "—" it was in nothing."—" was not wrapped up," and these statements she reiterates, and says that the defendant took the money out of his pocket, a statement hard to be believed, as the money could not have been in smaller bills than $100 each, unless the pocket from which it was taken was of greater capacity to carry money than is usually found about one's clothes. Although Quidley had talked with the plaintiff about this suit, knew what the suit was about, expected to be a witness, yet he neither mentioned to her nor to any one else anything about this payment, nor did Lou Clark mention it to a living soul until she was examined as a witness, if she is to

be believed.  That the defendant paid his mother $4,000 at her home on one of the back streets of the city of Norfolk, after night, in the presence of witnesses of the character of Quidley and Lou Clark, and that she took the money and put it under the bed, is absolutely incredible.  She is shown to have been a careful business woman, a successful business woman, up to the time when she was tortured by the persistence of her son to get money from her, and to finally get from her an absolute conveyance for every vestige of property she owned in the world.

All the circumstances of this case corroborate fully and effectually the testimony of witnesses to the effect that about the time these deeds were obtained from Mrs. Todd she was a miserable and distressed woman; that it preyed upon her mind that she had done something wrong, and that she was stripped of all of her property by one in whom she had confided, and who had so conducted himself towards her as to cause her to believe that he would betray the confidence she had reposed in him.  It is a significant fact, testified to by defendant's witness, Nottingham, who wrote all of these deeds, that in April Mrs. Todd and her son came to his office together, gave him the data by which to write the first three deeds, and, after he had written them, Mrs. Todd and her son came back to his office together, when witness read the deeds over to her, and Mrs. Todd refused to sign them as written, and gave as a reason that " it was a pretty hard thing for her to get clear of her property in her lifetime," and added that " she would not sign them that way."  Now, if her son was to pay her the full value for her property, and had actually paid her $2,000, as he claims to have done, why should she have made this remark in his presence?  It could not have been said by her that she was getting clear of all of her property in her lifetime if her son was to pay her the consideration for which the deeds were made, and had paid her $2,000 on this account.  After having made this remark she left the office, leaving the deeds there, and it was more than a month after before she signed them.  Why

the hesitation if the transaction with her son was fair, fully understood by her, and she was to convey him willingly her entire property? The whole case has stamped upon it fraud of the worse character; a fraud so clearly established that a court of equity could not hesitate for one moment to set aside and annul the whole transaction, unless by clear and satisfactory proof the defendant has shown the payment of the consideration for the deeds obtained by him from his mother. This, as we have seen, he utterly fails to establish. He vainly endeavors to make the receipt, stamped by the evidence a forgery, for $1,580, represent the Chapel Lane property and the three Huntersville lots, which he declared in his answer he paid nothing for, forgetting that the consideration for the Chapel Lane property ($1,200) and the three Huntersville lots ($750) is $1,950, and will not therefore tally with the $1,580 receipt. The receipt for $1,580 specifies on its face that it was on account of sale of other real estate of Mrs. Todd's, describing each piece by location, number, &c. The Chapel Lane and Huntersville lots are not mentioned in it, and it concludes with the words " the balance of $4,000 to be paid when the deeds are signed and delivered," and is dated July 10, 1895. It could have no reference to the Chapel Lane property or the three Huntersville lots, because the receipt of $2,000 of April 25, 1895, on its face shows that it was given on account of the Chapel Lane and Huntersville lots, and besides his witnesses Du Pass and Hawkins, although they are in irreconcilable conflict with each other, as we have already seen, with reference to what took place when this receipt was given, say that this $2,000 was paid in cash on account of the Chapel Lane and Huntersville lots. The effort made by the defendant to establish by satisfactory proof that he paid the consideration named in these several deeds signally fails.

To this is added the abundant proof in the record that at the time he claims to have paid all of this money to his mother in cash for her property, he was absolutely insolvent. He owned

and possessed no property, real or personal. The little business that he conducted (of boarding horses) was all done in his mother's name. An execution for $80 had to be returned because he had no effects out of which it could be made, as he himself declared. He was assessed for only $10 worth of property in 1895. Not a particle of proof is offered by him to show where he got the $8,280; or from whom he got it; or what business he was engaged in to bring him in such a large amount of money—no deposits in any bank, no parties owing him anything, and absolutely no property, real or personal, at his command or under his control. It was necessary for him to produce all the proof which might have been reasonably supposed to be in his power of the reality and fairness of the transaction, and the absence of such proof is fatal. Such proof is vital to uphold the transfer of this real estate, surrounded, as it was, with suspicion; and this requirement is not met by the mere production of receipts, or the mere proof of payment without any attempt to show where the money came from, how it was obtained, or whose it was, or what was done with it. Bump on Fraud. Con., sec. 66.

Of the $8,280, and indeed we may add thereto the $1,950, making a total of $10,130, for, if we are to believe the witnesses who have testified in his behalf, this is the amount he paid his mother for this property, not one cent is accounted for, or found after her death, occurring but a short time after the receipt of this large amount of money, unless it be the $470 deposited by Mrs. Todd in bank for the benefit of herself and daughter. No effort is made by him to ascertain what became of this money, no surprise is expressed by him to his most intimate friends even, that this money was not found after his mother's death. For ten years Mrs. Todd was a depositor in the Bank of Commerce, but not a dime of this money was deposited there, or in any other bank in the city. The little sum of $470 deposited by her about ten days before her death to the credit of herself and daughter was doubtless saved from her rents from her property prior to its

acquisition by her son, and was declared by her to be all that she had left; that her son Charles had robbed her of her entire property. It is shown that he was not only constantly worrying his mother about money, and persistently harrassing her about the property until, to use her own language, " I have no peace of my life," and such declarations as these were often made by her prior to the execution of these deeds, and about the time they were executed, and afterwards, she was melancholy, depressed, and downcast. Prior to that time she was a woman of intelligence, and active in attending to her business matters.

The defendant relies more to uphold the transactions by which he acquired every vestige of his mother's property to the entire exclusion of his sister upon sarcastic criticism and vilification of plaintiff's witnesses than upon his evidence adduced to sustain the transactions as *bona fide*. True, some of the plaintiff's witnesses are from the lower walks of life; some of them colored, but it appears that they were intimates of Mrs. Todd and the defendant, with whom she talked freely with reference to her matters, and that the worst of them compare favorably as to character with many introduced on behalf of defendant. Some of the plaintiff's witnesses are intelligent, and, from the character of their testimony given in this case, they cannot be justly criticised or impeached. One of them is Mrs. Todd's nephew, in whom she had so much confidence that by a codicil to her will dated February 5, 1895, she made him her executor, with the declared purpose that he might look after her daughter's interest in the property. This witness and others had over and over again heard Mrs. Todd declare that it was her purpose to do as her will provided, divide her property equally between her two children. He, as well as other intelligent witnesses, testifies as to the changed condition of Mrs. Todd's mind about the time and after the deeds were made. It is perfectly apparent that the defendant had used, as an inducement to his mother to make a deed for her property to him, promises that he would look after and take care of the interests of his sister in the property.

Opinion.

The facts shown in the case, and the circumstances surrounding the transaction assailed, overwhelmingly contradict and destroy the evidence of the defendant, as to the payment of any consideration for the property in question. They are so strong as to outweigh the positive testimony of the witnesses as to such payments, and necessarily cause their testimony to be disbelieved. Therefore, it would be altogether inequitable and unjust to permit the defendant to retain the property to the exclusion of his sister acquired under the deeds obtained by him through fraud and deceit practiced upon his aged mother when she was in feeble health, weak in mind, sometimes in a state of melancholy, greatly troubled about herself and her affairs, oppressed by fears of the loss of her property, and danger to her life.

The only remaining assignment of error requiring consideration, if sustained, would only affect the costs to be borne by the appellant in this case, and that is to the action of the court below in ordering its opinion filed with the papers in the cause to be printed as a part of the record. The trial judge filed with the papers in the cause his reasons for his decision, and the decree appealed from refers to it as filed in the record, which was done manifestly for the purpose of explaining his decision. This being the case, the opinion thus referred to in the decree became a part of the record, and it was proper to copy it along with the residue of the record transmitted to this court upon an appeal taken from the decree. *Leonard* v. *Rixey,* 83 Va. 877-8; and *Burton, &c.* v. *Mills,* 78 Va. 470.

We are of opinion that there is no error in the decree appealed from, and it is therefore affirmed.

*Affirmed.*