# Wythebille

## THE NATIONAL VALLEY BANK OF STAUNTON v. M. ALICE ROUDABUSH, J. W. ROUDABUSH, AND OTHERS.

June 8, 1938.

Present, Hudgins, Gregory, Browning, Eggleston
and Spratley, JJ.

The opinion states the case.

*J. H. May* and *J. M. Perry*, for the appellant.

*George D. Conrad* and *W. Terrell Sheehan*, for the appellees.

HUDGINS, J., delivered the opinion of the court.

The National Valley Bank of Staunton filed its bill alleging that M. Alice Roudabush and her husband, J. W. Roudabush, were indebted to it in the sum of $4,550, and

that on December 15, 1932, without valuable consideration and with intent to hinder, delay and defraud creditors, they executed a deed purporting to convey 186 acres of land and all their personal property, including "farming equipment, machinery, live stock" and certain household articles owned by the grantors and situated on the farm, to their three children, Waldo W. Roudabush, Mary Sue Roudabush and Virginia Shreve. The respondents filed joint and separate answers denying the material allegations of the bill, and alleging that they had paid adequate consideration for the property described in the deed. The chancellor held the deed valid and dismissed the suit. The National Valley Bank of Staunton obtained this appeal from that decree.

The conceded facts are that in 1922 Mr. and Mrs. Roudabush sold the farm in controversy, including the live stock and implements then on the place, for $38,000. As a part of the purchase price a house and lot in Staunton, referred to in the evidence as the Kalorama street residence, valued in the trade at $18,000, was conveyed to Mr. Roudabush. Mrs. Roudabush was given, or took, as her interest in the land, $15,000 in bonds secured by a deed of trust on the farm. The purchaser failed to pay these bonds at maturity, and in May, 1928, Mrs. Roudabush, at public sale held under the deed of trust, purchased the farm for $16,800. In order to pay the expenses of sale and other bonds secured by the deed of trust in the hands of a third party, Mr. Roudabush borrowed from appellant, on his note, with his wife as endorser, the sum of $4,000. This note was renewed from time to time, and on the date of the conveyance the $4,000 debt, with some other smaller obligations, was still due the bank. Judgment was obtained on these notes at the October term, 1933, of the Circuit Court of Augusta county.

The farm and the personal property described in the deed were all the assets owned by Mrs. Roudabush. Her husband owned the Kalorama street residence, subject to a lien of $3,000 that he and his wife had executed in February, 1932, to secure other creditors of the husband. In 1933, at a sale held under this deed of trust, the residence brought

$3,600, not more than sufficient to pay the expenses of sale and the debts secured.

The general principles applicable to transfers of property from parents to children under these circumstances are well settled, and are stated in the following excerpts from a few opinions of this court.

The relationship of the parties (father and son) and the insolvency of the grantor, do not of themselves constitute badges of fraud and relieve the creditors from proving the charges of fraud set up in their pleadings. *Johnson* v. *Lucas,* 103 Va. 36, 48 S. E. 497; *Lipman* v. *Norman Packing Co.,* 146 Va. 461, 467, 131 S. E. 797.

"While fraud must be clearly proved by him who alleges it, it is not necessary that it should be expressly shown. It is rare that it can be. The participants are not apt to discuss it, but actions speak louder than words, and the transaction itself often furnishes proof of the fraud that is entirely satisfactory." *Crowder* v. *Crowder,* 125 Va. 80, 99 S. E. 746, 748; *Hazlewood* v. *Forrer,* 94 Va. 703, 27 S. E. 507; *Todd* v. *Sykes,* 97 Va. 143, 33 S. E. 517.

Chief Justice Campbell, in *Haynes* v. *Bunting,* 152 Va. 395, 401, 147 S. E. 211, 213, said: "While it is true that the relationship of mother and son does not of itself constitute fraud, yet a transaction between parties so closely bound together, where the rights of third parties are involved, calls for the closest investigation." See *Dodds* v. *Lafon,* 153 Va. 110, 117, 149 S. E. 417.

In *Fowlkes* v. *Tucker,* 164 Va. 507, 514, 180 S. E. 302, the following is said (page 305): "As a general rule the burden of proof rests on him who charges fraud, and not on him whose conduct is charged to be fraudulent. But, where the transaction assailed is between brother and brother or other near relatives, only slight evidence is required to shift the burden of showing its *bona fides.*" *Mankin* v. *Davis,* 82 W. Va. 757, 97 S. E. 296; *Carlsbad Mfg. Co.* v. *Kelley,* 84 W. Va. 190, 100 S. E. 65; *Hickman's Ex'r* v. *Trout,* 83 Va. 478, 3 S. E. 131; *Todd* v. *Sykes,* 97 Va. 143, 33 S. E. 517. See *Brunswick Bank & Trust Co.* v. *Valentine,*

158 Va. 512, 164 S. E. 569; *Flanagan* v. *Parsons,* 167 Va. 6, 187 S. E. 473; *Francisco* v. *Neel,* 167 Va. 13, 187 S. E. 495.

Appellees contend that the *bona fides* of the consideration is established by (1) the value of the Kalorama street residence, (2) the promise to support the grantors so long as they lived, (3) the existence and discharge of the following debts claimed to be due by Mrs. Roudabush: (a) $4,565.90 due to Mrs. Miller, a twin sister of Mrs. Roudabush, (b) $1,600 due to Virginia Shreve, and (c) $2,233.69 due to Waldo W. Roudabush.

Experienced business men residing in Staunton, who knew real estate values and who were familiar with the Kalorama street residence, testified that in 1932 the value of this house and lot was from eight to ten thousand dollars, but it was sold during the depression and, hence, there were few buyers willing to bid on it. Both Mr. and Mrs. Roudabush testified that they thought the property was worth at least $8,000, sufficient to pay the liens on it and the amount due appellant, that they offered to give appellant a second lien on the property to secure the amount due it, but appellant refused to take the security. After the sale Mr. Roudabush made an unsuccessful attempt to have the sale set aside on the ground that $3,600 was a grossly inadequate price for the property.

These facts are pertinent and are entitled to due consideration in determining whether or not the transfer of the property to the children is tainted with fraud. However, such facts are not alone sufficient to sustain a mere voluntary conveyance against the claim of existing creditors if a suit to invalidate the voluntary conveyance is brought within five years from the date of recordation. See *Morriss* v. *Bronson & Moore, Receivers, ante,* page 516, 197 S. E. 479, opinion announced at this term of court.

No stress was made in the argument upon the grantees' promise to support the grantors. No such promise was incorporated in the deed, and even if it had been, ordinarily such a consideration for the benefit of the grantor

is not valid as to existing creditors of the grantor. See 6 R. C. L. 546; *Consolidated Rendering Co.* v. *Martin,* 128 Me. 96, 145 A. 896, 64 A. L. R. 790; but see *Bruce* v. *Dean,* 149 Va. 39, 140 S. E. 277.

Appellees rely wholly on the oral testimony of members of the family to prove that the obligations asserted against Mrs. Roudabush, at their inception, were based on promises to repay, thereby creating, at the time, the relation of debtor and creditor between Mrs. Roudabush and Mrs. Miller, Waldo W. Roudabush and Virginia Shreve. Mrs. Miller and her husband, who was a practicing attorney, lived in Los Angeles. She had no children of her own, and was devoted to her nieces and nephew. She made frequent visits to her sister in Augusta, sometimes staying as long as six months. Each member of the family testified that since 1908 Mrs. Miller had, at various times, sent money to or made expenditures for the benefit of Mrs. Roudabush.

In the spring of 1932 Mrs. Miller, while on a visit to her sister, who was then at the Kalorama street residence in Staunton, called a family conference and, for the first time, demanded a settlement or repayment of all sums that she had given or expended for the benefit of her sister. Mrs. Roudabush told her that she was not able to pay the money and that the farm would not, at that time, bring its full value. Thereupon Mrs. Miller proposed, subject to Mr. Miller's approval, that she and the two children cancel all indebtedness owing to them by Mrs. Roudabush, and that in consideration therefor Mr. and Mrs. Roudabush should convey the farm and the personal property thereon to the three children. As a further consideration, the children "should look after our mother and father, and furnish them food and clothing and medical care all the rest of their lives." This proposal was accepted, and when Mrs. Miller returned to California she talked the matter over with her husband, and wrote Mrs. Roudabush that Mr. Miller approved. Shortly thereafter the deed now under consideration was executed. Mrs. Miller denied any knowledge of the debts due appellant and said that her reasons for making

the proposal were that she wanted to do something for the children and, on account of her impaired health, to get her financial affairs settled.

The difficulty we have in accepting this, and other oral testimony of members of the family, is the total lack of written or documentary evidence, or other corroborating circumstances tending to show that at the time the money was advanced, it was the intention of the parties to create the relation of creditor and debtor. Mrs. Miller and members of the family testified that the amount due her was $4,565.90, comprising seventeen items and interest. The first item is $200 sent to Mrs. Roudabush in 1908 for the purpose of buying a surrey and harness immediately after a fire had destroyed some buildings on the farm. The next item is $250 sent in 1913 to purchase ponies and a cart to be used by the children in going to and from school. Another item is $500 sent in 1925 to defray the hospital and surgical bills incurred for the nephew. Other items totaling $1,050 were claimed to have been spent by Mrs. Roudabush on a trip for her health to California, and for nurses and medical bills incurred while on the trip. Mrs. Miller stated that the money was sent to Mrs. Roudabush by her husband at her request and in response to letters from Mrs. Roudabush asking for it, yet neither Mr. nor Mrs. Miller made any memorandum of the dates or the amount of the money sent. They did not request Mrs. Roudabush to sign a note, bond or other written obligation for the debt. None of the letters were retained, or, if retained, introduced as evidence. These items extended over a period of twenty-three years, yet no demand for payment of interest or settlement was made until 1932 when it was apparent that both Mr. and Mrs. Roudabush were in failing circumstances, and that they were compelled to give a mortgage on the Kalorama street residence to satisfy pressing demands. The only explanation of this unusual situation was the statement of Mrs. Miller that "she (Mrs. Roudabush) was my twin sister, very near to me, and she promised to pay me back the money, and her word is as good as her bond."

When Mr. Miller was asked on cross-examination about his failure to keep letters, copies of letters, or cancelled checks for the money sent, he replied that he had "no normal practice pertaining to a matter of this kind." In reply to another question, he said, "I don't think the way I conduct my business in other matters has anything to do with this case." Again, when asked if he had any intention of taking any action on the obligation, he said, "I hadn't formulated any complaint or suit, if that is what you mean," and further, "I loaned it upon a promise to pay it back and to pay interest on it for the time they had it, and, knowing the people as I did then and do now, I believed if they had the money they would pay it back." Yet no contemporaneous promise to repay the money was preserved, and no original entry of the amount of the money was ever made.

The only writing tending to substantiate these statements was a small memorandum book kept by Mrs. Roudabush and introduced by her. She said that the entries were made in 1927 from some papers because she "thought it would be easier to keep it in a book." When asked why she did not keep an account of her son's indebtedness to her, she replied, "I have been such a busy woman, I could not keep books everywhere and I can trust him," and when asked if she could not trust her sister said, "I borrowed that money." After 1927 the only entries made in this book were one in 1928 for $50 and two in 1931 for $65 and $75 respectively. Every item, except the last two, was barred by the statute of limitations at the time the deed was executed.

It seems incredible that a creditor should advance, even to a member of his own family, the sum of $2,975, make no entry of the time or the amount of advances, retain no letters asking for a loan of the money, or cancelled checks showing that the money was actually paid, and permit an open account in this unsettled state to continue for nearly a quarter of a century without request for a settlement or a payment of interest. A conveyance in consideration of such stale demands by a debtor who is insolvent or in failing cir-

cumstances, is strong evidence of an intent to hinder, delay or defraud creditors.

The evidence tending to establish a debt of $1,600, which is claimed to be due the daughter, Virginia Shreve, is likewise vague and unsatisfactory. Members of the family testified that this obligation was the sum of $800 due for services rendered the mother by the daughter and $800 loaned the mother. Mrs. Roudabush, in dealing with her daughter, did not follow the same course she did in dealing with her sister as she did not keep account of the amount due for services or the amount of money borrowed from her daughter, and hence did not, of her own knowledge, know the extent of these obligations.

This daughter lived at home with her parents. In 1924 she was employed, and from that date to February, 1928, worked in different offices including the City Treasurer's office of Staunton. She made $15 a week; the highest salary she received was $75 a month. On October 22, 1928, she married, and lived with her husband in her father's home. Her husband took his meals elsewhere and paid no rent for the rooms occupied by him and his wife. In June, 1930, Mrs. Shreve and her husband moved into their own home. No account was kept of the money loaned to her mother, and the testimony as to the length of time she was employed by her mother is vague and indefinite. Her deposit book, produced in evidence, showed that most of the money earned during the time she was employed was deposited in the bank and totaled $1,531.50. Upon being asked the amount actually due her, she replied, "I never kept a record of what I loaned; I loaned a dollar here and a dollar there, and I paid for this and for that; it took about one-half of what I made and I put it at $800. I am positive it was that and it would be more than that, but I put it at $800, for I wanted to be fair about it." She introduced a number of cancelled checks, only three of which were payable to her mother and these totaled $105. When asked to explain the difference in the amount of the checks and the amount of money she claimed to have advanced her mother, she said,

" * * * adding up what I had made and what I had spent; any one can tell you I was not extravagant; I am putting it mildly when I said it took half of it." "You kept no accounts whatever?" A. "No, sir."

██ Here is a daughter who is working and living at home with her parents during a four-year period from 1924 to 1928. She pays no board, spends some money for the benefit of the family, and transfers $105 to her mother. She produced checks payable to the local merchants and stated that they were for the benefit of the family. Neither she nor her mother kept an account of how much money was so spent by the daughter. When her parents are pressed by creditors she produces an account and claims that her mother owes her the money spent for the benefit of the family, but is unable to produce any evidence as to the amount of indebtedness, and in guessing it, takes half the amount she earns and charges it to her mother as a debt. To discharge this alleged debt, her mother conveys her an interest in the farm. This type of evidence falls far short of showing the *bona fides* of the transaction between mother and daughter.

Mrs. Shreve testified that, because of her mother's sickness, she was compelled to stop work and keep house for the family, and that for this service her mother promised to pay her $5 a week. The evidence is vague and uncertain as to just what day this employment began or how long it lasted. She could hardly have begun working for her mother for $5 a week until after February, 1928; she left her mother's home in June, 1930. At $5 a week, it would be necessary to work 160 weeks, or more than three years, to earn $800. From February, 1928, to June, 1930, is only two years and four months.

Another alleged consideration for the conveyance is a claim of $2,233.69 that her son, Waldo W. Roudabush, held against his mother. The situation revealed by the testimony is that both parents were in bad health, neither able to earn a living, and the only source of income was the farm purchased by the mother in 1928. One daughter, Mary Sue

Roudabush, was a semi-invalid suffering with tuberculosis. The only son, Waldo W. Roudabush, twenty-seven years of age, was employed as a salesman. He lived with his parents and paid no board or lodging. The farm was operated by tenants under contracts. The net income is not stated, but the inference from the evidence on the question is that it was not very much. Whatever it was, the tenants either sold the produce and delivered the money to the landlord, or left the landlord's part of the money with the purchasers of the crops.

The obligation asserted by the son against the mother is, like the other accounts, not supported by any contemporaneous entry or other documentary evidence. The account begins in May, 1928, and extends to December 15, 1932, but contains no original entry or contemporaneous vouchers. The son testified that the bills and receipts which sustained the account were exhibited to his mother and destroyed. The first item on the account is $1,350 for "salary $25.00 per month for fifty-four months (May 28, 1928-Dec. 15, 1932)." Other items included are $67 for sixty days work on the farm, $25.80 paid as board, and $112 for living expenses of his parents while living in town. The mother testified that she employed her son as manager "to do extra work, fix up the place," at $25 a month, yet the account contains an express charge for each day's work. Other than the sixty days that the son actually worked on the farm during a period of more than four years, he visited it once or twice a week and then he brought his mother to get vegetables out of a garden which the tenants cultivated for her. Part of this alleged debt, like the alleged debts claimed by Mrs. Miller and Mrs. Shreve, was barred by the statute of limitations at the time the deed was executed. The circumstances of the parties, the discrepancies in the account, the conflicting evidence on the duties the manager was supposed to perform, and the fact that it was presented and approved at a family conference along with the accounts of Mrs. Miller and Mrs. Shreve, raise serious doubt as to the *bona fides* of the obligation.

In West Virginia it is held that a transfer of property to a close relative made in consideration of debts barred by statute when the grantor is insolvent constitutes a strong circumstance tending to show fraudulent intent against creditors whose debts are not barred. *McCarthy* v. *Saunders,* 83 W. Va. 612, 98 S. E. 800.

In *Robinson* v. *Bass' Adm'r,* 100 Va. 190, 196, 40 S. E. 660, 662, this is said: "The fact that the debtor was insolvent when the new promise or acknowledgment was made, would be a circumstance to be considered in determining the question whether or not there was collusion between the parties to the transaction, but the making of the new promise or the acknowledgment of the debt, from which a promise to pay might be implied, is not alone proof of collusion." See 27 C. J. 539.

J. Wesley Taylor, the attorney who prepared the deed, was the only party outside of the immediate family who was called as a witness for appellees to testify concerning the transactions. On this occasion, December 15, 1932, the debts alleged to be due Mrs. Miller and the two children were not mentioned to the attorney; indeed, he stated that he had never heard of Mrs. Miller. The impression that the grantors created upon the attorney was that the parents desired him to prepare a deed of gift from them to their children. He stated, "if they had discussed with me any consideration or cancellation of the debts to the children, I feel reasonably certain it would have been incorporated in the deed. There was nothing discussed with me of any indebtedness between them and the children. If there was any, it was not discussed with me. Further, Mr. Waldo Roudabush, if he was present, and I have no recollection of his being present,—is entirely wrong in saying that I said I did not want to listen to it and was not interested in any indebtedness owing by their father to them, because, in my judgment, that was proper to discuss and should have been incorporated in the deed, and they did not discuss that."

Conceding that the money was actually advanced by Mrs. Miller to Mrs. Roudabush as claimed, that the money was

spent by Mrs. Virginia Shreve to help support the family as she said it was, that she looked after her mother and kept house for her parents at the time she said she did, and that Waldo W. Roudabush took his mother to the farm and assisted her in making contracts with the tenants and in purchasing live stock as he said he did; without more, these transactions of themselves do not create the relationship of debtor and creditors. To believe that these parties advanced the sums and did the work in consideration of a valid contract to pay, under the circumstances of this case, strains credulity to the breaking point.

"Experience attests that in a majority of cases fraud can only be established by circumstances. The motives and intentions of the parties can only be judged of by their actions, and the nature and character of the transaction in which they are engaged. These often furnish more conclusive evidence than the most direct testimony." *Parr* v. *Saunders*, 1 Va. Dec. 724, 731, 11 S. E. 979, 981.

For the reasons stated, the decree of the trial court is reversed and the case remanded with directions to the trial court to enter an order reinstating the case on the docket and declaring the deed in question invalid as to appellant's judgments, and for such further proceedings not in conflict with the views herein expressed as may be appropriate.

*Reversed and remanded.*