### BOWEN v. KUTZNER et ux.

(Circuit Court of Appeals, Fourth Circuit. November 5, 1908.)

No. 790.

1. CONTRACTS (§ 99*)—VALIDITY OF ASSENT—CONTRACTS BETWEEN BROTHER AND SISTER.

While a brother and sister may lawfully contract with each other, in case of such contracts, sight ought never to be lost of the fact of the relationship existing between them and of the duty they owe one to the other to deal with the utmost frankness and good faith, and where one, who secures a large advantage by the contract, was fully informed as to the matters to which it relates, while the other was not, the presumption is against the validity of the contract, and the burden rests upon the one so informed to fully establish his contract and remove from it every doubt or suspicion that may attach to its execution.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 448; Dec. Dig. § 99.*]

2. CONTRACTS (§ 94*)—VALIDITY OF ASSENT—CONTRACTS BETWEEN BROTHER AND SISTER—UNDUE INFLUENCE.

An intestate left an estate of some $250,000, mostly accumulated during the last few years of his life, and consisting principally of his interest in two coal companies, in which he was a large stockholder. He left as his heirs a son and a younger daughter. The son was secretary and treasurer of one of the companies in which his father had given him stock, had thus been associated with his father in business, and was thoroughly acquainted with his property and its value. The daughter had married when her father was comparatively poor, lived several hundred miles distant, and knew nothing of his affairs. After the father's death, on invitation of her brother, she visited him, and while there was taken by him to the office one evening and told that it was desirable to settle the father's estate between them; that such was the father's desire, and also that it should be kept secret; that it was their father's wish that her brother should have the stock in the coal companies and should take care of her, and that the father would not have owned such stock but for her brother. Shortly thereafter, she was taken one evening to a bank where were her brother, his attorney, and two of his friends and business associates, and there she signed an agreement prepared by the attorney dividing her father's property by which her brother was given all of the stock in the two coal companies, and the remainder of the property was about evenly divided, she being given an advantage of perhaps $1,000. She was not advised to seek outside counsel, and did not, nor was she told the value of the respective properties. As a matter of fact, the stock in the coal companies constituted by far the greater part of the estate. *Held,* that in the absence of such advice or information, which it was the duty of her brother to give her, in view of their relationship and the circumstances, and the great advantage he obtained by the settlement, the agreement was void for fraud and undue influence.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 420-430; Dec. Dig. § 94.*]

---

* For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3. GIFTS (§ 18*)—INTER VIVOS—NECESSITY OF DELIVERY.**

Gifts inter vivos of personal property, to be effective, must be accompanied by the delivery of possession; the donor parting with all present and future dominion over it. The donor must be devested of, and the donee invested with, the right of property in the subject of the gift. It must be absolute, irrevocable, without any reference to its taking effect at some future time; and without such proof, clear and explicit, the gift fails.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. §§ 29–33; Dec. Dig. § 18.*]

**4. GIFTS (§ 49*)—INTER VIVOS—EVIDENCE—TRANSFER OF CORPORATE STOCKS.**

Evidence considered, and *held* insufficient to sustain the validity of a transfer of stock claimed to have been a gift from a father to his son, such stock constituting the larger part of the owner's estate, and the transfer having been made on the books of the corporation after his death by an attorney in fact under authority of an assignment and power of attorney indorsed on the certificates as of a date shortly before his death, but which was in fact signed by him in blank several years before on pledging the stock as collateral security to a bank.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. §§ 95–99; Dec. Dig. § 49.*]

Appeal from the Circuit Court of the United States for the Southern District of West Virginia, at Bluefield.

The bill in equity in this cause was filed by Alice Kutzner, her husband, John T. Kutzner, joining with her, against her brother, W. H. Bowen, the defendant in the lower court. and appellant here, for the purpose of having rescinded a certain contract in writing entered into on the 25th day of November, 1902, between the female plaintiff and her brother, the appellant, filed as "Exhibit Contract" with the bill, whereby they divided between them, on the terms and conditions set out in said contract, the estate whereof their father, Jonathan P. Bowen, late of the county of Mercer, W. Va., shortly theretofore died seised and possessed, leaving as his sole heirs at law and distributees the said Alice Kutzner and W. H. Bowen. The preamble of the contract is as follows: "Witnesseth, that whereas, Jonathan P. Bowen, father of both parties hereto, departed life intestate, leaving considerable property; and whereas the said Harry Bowen and the said Alice Kutzner, parties hereto, are the only children and his sole surviving heirs; and whereas, it is the mutual desire of the parties hereto to amicably divide between themselves the property inherited from their father, the said Jonathan P. Bowen; and whereas, it is mutually recognized by the parties hereto, that it was the desire of the said Jonathan P. Bowen, as expressed in his lifetime, that the said Harry Bowen, party of the first part, should inherit his stock in Booth-Bowen Coal & Coke Company and Norfolk Coal & Coke Company." The property covered by the contract consisted of, first, 125 shares of the capital stock of the Booth-Bowen Coal & Coke Company; second, 260 shares of the capital stock of the Norfolk Coal & Coke Company; third, the property specifically set forth in clause 4 of said contract, as follows: "Fourth: The following property owned by said Jonathan P. Bowen shall be divided as nearly equally as possible between the parties hereto: 6 shares of stock in Bluefield Telephone Company; 80 shares of stock in Ridge Land Company; 50 shares of stock in Bramwell Water Company; 25 shares of stock in Eureka Land Company; 110 shares of stock in W. M. Ritter Lumber Company; 10 shares of stock in Bank of Bramwell; cash on deposit in Bank of Bramwell, amounting to $17,623.42." By a subsequent provision of paragraph 4 of this contract, it is provided that the property set forth in said fourth paragraph should be divided equally between the parties, except the 25 shares of stock in the Eureka Land Company, of which the defendant, Bowen, was to have 12 shares, and the plaintiff, Alice Kutzner, 13; by the third clause, that said Alice Kutzner was to have the house and lot, of small value, of which

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

her late mother died seised in St. Clair, Schuylkill county, Pa.; and by the concluding paragraph of said contract it was provided: "Fifth: Any other property belonging to the said Jonathan P. Bowen, deceased, of which the parties hereto may not now be advised, shall be divided equally between them whenever said property shall be discovered."

The effect of this agreement was to give the appellant, Henry Bowen, unconditionally, the stock of the decedent in the Booth-Bowen Coal & Coke Company, and in the Norfolk Coal & Coke Company, which constituted in value the bulk of his estate, and to divide between himself and sister the residue of the estate, money in bank, and various stock ownerships in various companies set forth in paragraph 4 of the agreement, much of which at least may be said to be of doubtful value, and also to give to the female plaintiff the undivided one-half interest in the house and lot in St. Clair, Schuylkill county, Pa., of which their mother died seised, and supposed to be worth about $1,000.

The plaintiff's case set forth in her bill, briefly, is that her father, in the year 1885, having by care and frugality lasting through more than 50 years, engaging in various capacities ranging from working in the breakers to mine foreman, in the anthracite region of Pennsylvania, accumulated a sum of money amounting to $5,000, was induced to leave Pennsylvania and settle in the new coal fields of West Virginia, now famous as the "Pocahontas Flat Top Coal Field." That at said last-named place he formed a partnership with Messrs. William and James Booth, under the name of William Booth & Co., using his entire cash capital in paying for a one-third interest in the firm. Said firm leased from the Bluestone Coal Company a tract of land on Simmons creek, in Mercer county, W. Va., and engaged actively in mining and manufacturing coal, and the general retail mercantile business; that this business was very profitable, and soon largely increased; that a corporation was formed known as the Booth-Bowen Coal & Coke Company, absorbing the former copartnership, including the lease aforesaid. The stock of this company was fixed at $75,000, and said Jonathan P. Bowen's share therein consisted of 250 shares, or one-third; that the business of this company became very successful, yielding handsome dividends, and large sums were expended on improvements and extending the same; and that said Jonathan P. Bowen then acquired by purchase of James Booth his one-third interest in the company. The business was especially valuable during the years 1899, 1900, 1901, and 1902. That some two years after her father left Pennsylvania, as aforesaid, in 1887, her brother, W. H. Bowen, moved from Pennsylvania, and accepted a position in his father's mine. The evidence shows that young Bowen was first blacksmith in the mine; then became assistant superintendent, and subsequently treasurer of the company; that, shortly after his removal to West Virginia, her father gave to her brother one-half of his original shares of stock in the company, to wit, 125 shares in the Booth-Bowen Coal & Coke Company, which complainant charged to be an advancement to him; that at the time of his coming to West Virginia her brother was without means, either money or property, with which to pay for the stock; that on the 10th day of October, 1902, her father died, leaving an estate worth between $200,000 and $250,000; and that shortly thereafter her brother wrote her an urgent letter to come to his home in Bramwell, W. Va., saying that Mr. Mann, the president of the bank, wanted to see her, that there was a matter which needed her presence; that she wired asking to delay her trip for a week, which was arranged; that soon after the 1st of November she went to her brother's home, and stayed there several weeks; that for several days after reaching his house nothing was said about business affairs, until one afternoon she was invited by her brother to go to the office of the company, the Booth-Bowen Company, at Bramwell, W. Va., where, with no one present except her brother and herself, he for the first time mentioned the subject of the division of their father's estate, telling her that it was the wish of her late father that he, W. H. Bowen, should have all the stock in the Booth-Bowen Coal & Coke Company and in the Norfolk Coal & Coke Company held by their father at the time of his death, and that said W. H. Bowen should "take care of Alice," meaning the female plaintiff. He further told her that, while the stock in

these two companies stood in the name of their father, he had bought the same, and that but for him his father would never have had it. He also told her that, with the exception of one share of stock, he had bought and paid for with his own money the stock held by her father in the Bank of Bramwell; that she was very much shocked at the apparent partiality shown in this division of the estate ascribed to her father, but felt that, if it was really his wish, she would carry the same out regardless of the consequences to herself; that she was especially warned and requested by her brother not to mention the matter to any one; that plans for the division of the remainder of the estate were discussed, and it was suggested that no writing of any kind would be needed; and several days later, her brother informed her that a writing would have to be made by each of them to avoid trouble, as he was advised, and that he expected his attorney, Mr. Rucker, up from Welch that evening, and asked her to go up with him to the bank and fix up matters; that late that evening they did go to the bank, met Mr. Rucker, and there were also present Messrs. Jenkin Jones and J. B. Perry, who acted as witnesses—Jones being the only one of the persons present personally known to her; that it was about 8 o'clock at night before the contract was signed; that the same was read to her by Mr. Rucker, but that no provision of the settlement was discussed, and no papers, other than the contract, produced and shown; that she signed the same, being utterly without knowledge as to the value and condition of her father's estate at the time; that she had the fullest confidence in her brother, and believed that he had properly obligated himself to, and would carry out the wishes of her father respecting herself; and that the only remark he made about the property, previously to the meeting when the contract was signed, other than hereinbefore stated, was: "As for the colliery up here (meaning the Booth-Bowen Colliery), there will be enough in it for both of us"; that, assuming it to have been the purpose of her brother to "take care" of her, as he stated it was the wish of her father that he should do, and which she supposed he had obligated himself to do by the contract aforesaid, he has utterly refused to make any provision whatever for her; that since the complainant realized the nature and character of the contract, which she did not do until she examined the same while returning to her home, she at once repudiated and declined to be bound by it, and from that day has endeavored to secure a fair and just division of the estate left her by her father; that although she promptly so informed her brother, she did not succeed in seeing him until the month of May, 1903, when he called on her at her home in Wilkesbarre, Pa., and they discussed the contract; that in that conversation she informed her brother all she desired was an equal division of the estate, and he then and there declared that it had been made, and, upon her calling his attention to the fact that by the contract the bulk of the estate had gone to him, he replied in substance that she could depend upon him to do what was right and that she was amply protected by the contract; that she asked him if there wasn't something more she ought to have to show for what had been promised her; that he said, "No, you have me"; that she said, "Suppose something happens to you"; that he said, "You will find you are all right"; that she called his attention to the fact that no reason had been given for what would look to others as a one-sided affair; that he said there was no reason, "You were just as much to father as I [meaning her brother] was"; that she again asked him for something to show for it, and he said she did not understand it all, that she was all right, only she did not know it; that previously he had sent her $2,000, which she declined to accept, unless knowing in what way she was receiving the same; and on this occasion he wanted her to take $500, and insisted on leaving with her a check therefor, which she subsequently returned; that she used every effort to cause him to correct the contract, but without avail. She charges especially that, at the time of making the same, he was fully possessed of all information bearing on her father's estate, and as to which she knew little or nothing; that she supposed the contract embodied a provision obligating him to do what he said was her father's wish—that he should take care of her; and she averred and charged that it was not true that her father ever made any such request, either for her care, or that her brother should have all the

stock in the two coal companies referred to, which constituted the chief part of his estate, nor was it true that her brother, and not her father, had bought the coal stocks in question; that the fact that she was to be provided for, coupled with a desire on her part to conform to her father's wishes, formed the chief motive and consideration moving her to enter into the contract, and if the provision in her interest was omitted therefrom, and her father's wishes were never carried out, the contract so far as she was concerned, was without consideration; that the actings and doings on the part of her brother constituted a fraud upon her; and that she was entitled to have said contract annulled and set aside because of the lack of consideration therefor, and the false representations by which she was induced to sign the same, and the time, place, and manner in which it was secured, and because of her lack of knowledge, and opportunity of knowledge, of the matters about which she was dealing.

The complainant filed interrogatories with her bill, to which the defendant demurred, as well as to the bill. The demurrer was sustained as to the bill and interrogatories, except interrogatories Nos. 14 and 15. Thereupon the complainant amended her bill, to which the defendant again demurred, and answered. This answer denied generally the averments of the bill, especially all charges of fraud and wrongdoing on the part of the defendant, and that he had withheld from the complainant any information respecting her father's estate. He admitted the ownership by his father of the property set out in the contract; that his sister came to his house after the death of his father, at his invitation, and after staying there some time, the contract was made. He avers that it was the desire of his father that he should inherit all the stock owned by his father in the two coal companies; that he so informed his sister before she signed the contract; and that she consented to respect and be bound by the wishes of her father. He denied that his father ever made of him any such request to "take care of Alice," that he ever held out such inducement to her to sign the contract, or that it was the wish of his father that he should do so. He admits that he requested his sister to keep private what had taken place between them, but he had no ulterior motive in so doing, further than to respect his father's wishes; it being one of the latter's characteristics not to allow the public to have knowledge of his private affairs; and he felt that this should be especially carried out in dividing up his estate. He also denied that he ever held out to his sister that she would have any interest in the colliery, meaning the Booth-Bowen colliery, or that there was enough for both of them in it. He admits depositing to his sister's credit $2,000, referred to by her after his father's death, and alleges that he was prompted to do so by reason of his affection as a brother. He further denied that he had attempted to exercise undue influence over his sister, or had withheld any information from her; and insisted that the contract was entered into by her in good faith, and that she was satisfied with the same until others had intermeddled with his and her affairs; and that he had lived up to the contract in all respects.

To this answer, replication was duly made, depositions taken, and in the progress of the examination on the 28th of July, 1905, of complainant's witnesses, J. Walter Graybeal, secretary and treasurer of the Pocahontas Consolidated Company, of which the Norfolk Coal & Coke Company was a constituent company, with a view of ascertaining the number of shares of stock owned by Jonathan P. Bowen at the time of his death in said latter company, it appeared that 260 shares of stock of the Norfolk Coal & Coke Company, heretofore referred to as one of the subjects of litigation, was on the 16th day of December, 1902, transferred upon the books of said company to the defendant, W. H. Bowen, called "Harry Bowen," in the certificates, by virtue of an alleged power of attorney from said J. P. Bowen to Isaac T. Mann, dated 26th September, 1902, constituting said Mann his attorney in fact to make such transfer. Thereupon subsequently on the 16th day of January, 1906, the defendant amended his answer, setting up such transfer of stock, to the filing of which the plaintiff excepted, which exceptions the court overruled. The taking of depositions was continued, and thereupon the case was heard on the bill, amended bill, answer, replication, amended answer,

and replication thereto, and the depositions of witnesses, and the decree of the lower court entered annulling the contract between the complainant and defendant, because the same was procured by fraud, misrepresentation, and concealment, and without valuable consideration; and the court likewise decreed that the defendant's claim set up to the said 260 shares of stock in the Norfolk Coal & Coke Company, by virtue of the alleged assignment of stock, was not sustained by the proof, and that said stock constituted part of the estate of the decedent, Jonathan P. Bowen's estate, and upon his death intestate passed to his heirs at law and distributees; from which decree this appeal was taken.

Luther C. Anderson and A. W. Reynolds (Rucker, Anderson & Hughes, on the brief), for appellant.

T. L. Henritze and A. L. Williams, for appellees.

Before PRITCHARD, Circuit Judge, and PURNELL and WADDILL, District Judges.

WADDILL, District Judge (after stating the facts as above). Two questions are presented for determination by the court: First, whether the contract entered into on the 25th of November, 1902, by which the appellant secured to himself the large interest that he did in the estate of his father, by having his sister release to him all her interest in the stock referred to in the contract as the Booth-Bowen Coal & Coke Company and the Norfolk Coal & Coke Company, is a valid and binding one between the parties under the facts and circumstances under which it was entered into; and, secondly, the validity of the assignment of the stock of the Norfolk Coal & Coke Company set up in appellant's amended answer. We will first consider the law applicable to contracts entered into between parties related one to the other as these parties were, and made in the circumstances under which this contract was executed.

The fact that a contract between brother and sister may be lawfully entered into cannot be disputed. They have the same right to contract to and with each other relative to their property as other individuals. But in such contracts sight ought never to be lost of the fact of the relationship that exists between them, and of the duty they owe one to the other to deal with the utmost frankness and good faith. We have in this case an only and elder brother, dealing with his only sister, in making a settlement of their interests in their father's estate, by which contract it is conceded that the great bulk of the property of the deceased parent is parted with by the sister, and acquired by the brother, without consideration, and which she now charges was procured by fraudulent conduct and representations, and without her being informed as to her real interests, or the value of the same. Such a transaction should always be scrupulously guarded by parties occupying the relation and securing one an unfair advantage over the other. In Pomeroy on Contracts, § 269, in discussing what will be a sufficient concealment to warrant the rescission of a contract, it is said:

"If there is a relation of trust or confidence between the parties; if the person knowing the facts occupies a fiduciary relation towards the other— then the duty to disclose is clear. It is not necessary that such fiduciary relation should be expressed; in many cases it has been held to exist from the general circumstances."

"Mere concealment to afford general ground for rescission for fraud must be a willful suppression of such facts in regard to the subject-matter of the contract as the party making it is bound to disclose." Beach on Contracts, vol. 1, § 799.

"Where relations of trust and confidence exist, the duty to disclose is clear." Id.

And, in discussing inadequacy coupled with other inequitable incidents, Pomeroy says:

"If there is nothing but mere inadequacy of price, the case must be extreme, in order to call for the interposition of equity. When the inadequacy does not thus stand alone, but is accompanied by other inequitable incidents, the relief is much more readily granted." Pom. Eq. Jur. (3d Ed.) § 928.

"On the other hand, in transactions between this same class of parties (near relations) the circumstances may be such as raise a strong inference, if not win a presumption of bad faith, and especially where the party obtaining the benefit is in a position of natural superiority and command over the other, as father and child, an elder brother and younger sister, might raise a strong presumption of undue influence, and this calls for the interposition of a court." Id.

In Story's Equity Jurisprudence, vol. 1 (12th Ed.) § 251, it is said:

"Cases of surprise, and sudden action without due deliberation, may properly be referred to the same head of fraud or imposition. An undue advantage is taken of the party under circumstances which mislead, confuse, or disturb the just result of his judgment, and thus expose him to be the victim of the artful, the importunate, and the cunning. * * * The surprise here intended must be accompanied with fraud and circumvention, or at least by such circumstances as demonstrate that the party had no opportunity to use suitable deliberation, or that there was some influence or management to mislead him. If proper time is not allowed to the party, and he acts improvidently, if he is importunately pressed, if those in whom he places confidence make use of strong persuasions, if he is not fully aware of the consequences but is suddenly drawn in to act, if he is not permitted to consult disinterested friends or counsel before he is called upon to act, in circumstances of sudden emergency, or unexpected right or acquisition; in these and many like cases, if there has been great inequality in the bargain, courts·of equity will assist the party upon the ground of fraud, imposition, or unconscionable advantage."

The leading English case on this subject is Huguenin v. Baseley, 14 Ves. 273, reported in White & Tudor's Leading Cases in Equity (Ed. 1887) 1184, to which, with the notes, reference is especially made. In the latter case, Lord Eldon said:

"The question is not whether she knew what she was doing, had done, or proposed to do, but how that intention was produced; whether all that care and providence was placed round her as against those who advised her, who from their situation and relation with respect to her they were bound to exert in her behalf."

In Pomeroy's Equity, §§ 951 to 957, inclusive, will be found a general review of the same subject. The Virginia cases are Statham v. Fergusson, Adm'r, et al., 25 Grat. 28, 69; Davis et al. v. Strange's Ex'r, 86 Va. 793, 11 S. E. 406, 8 L. R. A. 261; Jones v. McGruder, 87 Va. 360, 12 S. E. 792; Todd v. Sykes, 97 Va. 143, 33 S. E. 517. The Virginia decisions referred to each contain a full consideration of this general doctrine; and in the first-named case, of Statham v. Fergusson, the facts bear a striking resemblance to those in this case, but in which the party to the contract sought to be, and which was

by the Supreme Court of Appeals set aside, was possessed of greater information as to her rights, and afforded greater opportunity than the plaintiff here to act independently. There, the stepsons-in-law of Mrs. Fergusson, who were the administrators of her deceased husband's estate, and her stepchildren, secured from her a deed whereby she agreed to accept, in lieu of her rights under the law, the provisions of a certain will that her husband had made, probate of which was not allowed because of a defective execution of the instrument; and, as a result, she gave up considerable property. The court said, speaking through Moncure, president:

"It was the duty of the administrators of her husband, invested as they were by law with the title to his whole personal estate, and standing as they did in the confidential relation in which they stood towards her, to take care that before she made a donation of her estate, or a large portion of it, to themselves, as she did, she should be fully informed of her rights on the subject, and the effect of her act, or at least should have ample time and opportunity to consult counsel and advise with disinterested friends; and they should have advised her to avail herself of those advantages. That uberrima fides, which the law expects and exacts of persons standing in such a confidential relation to another, required them to do so. Instead of doing so, if they did not advise and encourage, they, at least by their acts, facilitated the preparation and execution of the deed, when they must have known that she had not the necessary information and proper advice to enable her to act so wisely and discreetly in so important a transaction."

In Parker v. Parker, 45 N. J. Eq. 224, 16 Atl. 537, it is said:

"The doctrine of equity concerning undue influence is very broad, and is based upon principles of the highest morality. It reaches every case, and grants relief where influence is acquired and abused, or where confidence is reposed and betrayed. * * * It is especially active in dealing with gifts."

What has been stated applies to contracts generally between parties having the relation that these bore one to the other—one securing an advantage over the other; but it is doubly true when, as in this case, the one securing the advantage occupied a favored position of being thoroughly posted in and about what was being done, and the other in total ignorance thereof; one an experienced business man, engaged in the transfer of the stock of the corporation of which he was secretary and treasurer, and in the business of which he had been largely engaged, and the other an innocent woman, a sister living in a distant community. In such a case, the former receiving such infinite advantage, every presumption would be against the validity of so improbable a contract; and the beneficiary should, as it ought to be his pleasure to do, be required to fully establish his contract, and remove from it every element of doubt or suspicion that may attach to its execution; and the law thus rightfully places the burden upon him. Pomeroy, Eq. Jur. § 928; Todd v. Sykes, 97 Va. 143, 146, 33 S. E. 517, and authorities cited.

Coming to the consideration of the facts, we cannot fail to be impressed, upon a careful review of the pleadings and testimony in this cause, with the strong presumptions that exist in favor of the plaintiff against the defendant arising from the improbability that she would have done what it is now claimed she did; that is to say, in her poverty, strip herself mainly of her inheritance in the large and valuable

estate of her father, and give the same to her brother, who had an abundance, largely the result of his father's bounty, and the opportunity afforded him by the latter to make money, without consideration or hope of reward, had she been either fully aware of the facts in and about the transaction in which she was engaged, or fully realized the consequences of what she was doing. Nor can one fail, after reading carefully her deposition giving her story and version of what occurred, and that of her brother as to the same transaction, to note the apparent innocence and frankness of the one, and the coldness, secretiveness, and lack of sincerity of the other, as well as the full and complete explanation on her part of what she said and did, and his manifest reticence regarding the same transaction; the frequency with which he answers the most important questions, either "Yes" or "No," or "I did" or "did not," is most noticeable. This is strikingly illustrated in the effort to secure information as to the value of what the sister surrendered and the brother acquired. To this date, neither in his answer or deposition, or answer to interrogatories that would have elicited information on the subject, though an officer of one company, and a large stockholder in the other, has he vouchsafed to give the complainant or the court the slightest information as to the value of this property, although that fact has such important bearing upon the transaction. His failure to do so is a confession of his sister's charge respecting what she had given up, and his apparent reticence on the subject does not commend him as one who is seeking to act openly and fairly about the matter. Having admitted that as treasurer he had in his possession the books of the Booth-Bowen Coal & Coke Company, which would show the exact financial condition of the company, and that he had long had control of them, when asked to produce them, he declined so to do upon advice of counsel. When asked to give information respecting the dividends paid upon the stock, he replied that he would have to refer to the books; and when requested to do so, and state the amount, he again replied that "on advice of counsel I refuse to give the information." To an inquiry whether or not the dividends did not reach 25 per cent. per annum, he replied, "I refuse to answer the question." So that not only was the complainant, but the court is, left practically without information either as to the value of the stock or its earning capacity. These answers were made when this witness was under cross-examination in a litigation in which he was claiming the stock as against his sister, and, if he was thus noncommunicative under such circumstances, it is not unfair to assume that his sister, when dealing with him alone, was not favored with much information; and it may likewise be assumed that the questions asked would have been answered, if answers would have been favorable to the witness. The complainant's testimony briefly is that, having been persuaded to go to her brother's house, in connection with matters affecting the estate of her deceased father, she was taken privately to an office of the company, and there told by her brother that the two blocks of stock referred to would never have belonged to her father but for him, the brother. That it was the desire of the father that the brother should have

167 F.—19

them, and also that the brother should take care of her; and she was enjoined to keep the transaction secret; that having the assurance of being taken care of from her brother in mind, and having the utmost confidence in him, and believing his statement as to the acquisition of this property, and of the expressed wish of her father that he should have the stocks, and in turn take care of her, and under the belief that she was to be so provided for, she agreed to the conditions imposed by her brother for the division of the estate, by which he was to take the stocks referred to. That when subsequently she was invited at a late hour in the evening to meet her brother's lawyer, and while surrounded by his friends, for the purpose of consummating the transaction between them, which her brother had assured her was necessary, she in like good faith, and with unabated confidence in her brother, and without the slightest suspicion that any advantage would be taken of her, carried out the same, and signed the contract, never for a moment thinking that there was omitted therefrom what was the most important feature to her, namely, that she was provided for; that she was without representative or friend, away from home, staying at her brother's, without information on her part as to the extent and value of the property with which she was dealing, without independent advice from any one, or the suggestion that she have such advice; and in this manner the paper sought to be set aside was procured from her upon a false representation of the facts, and upon an erroneous idea on her part as to its contents, and without knowledge as to the extent of the interests with which she was parting. There is a direct conflict in the testimony between the brother and sister as to what occurred between them in connection with the division of their father's estate, especially as respects the father's wishes regarding this stock, and the desire of the father that the brother should take care of his sister, and the degree of information imparted to the sister; and though it may be said that while the brother denies her statements as to what occurred, so far as giving her information is concerned, he does not inform the court what it was he did tell her, or the details of the information he gave her, all of which he should and would doubtless have been anxious to give had the fact been true that any such material information had been imparted to her. The facts in the case bear out her version, and not his, and what admittedly occurred as to keeping the transaction secret, and the apparent effort to entrap the female plaintiff on cross-examination by having her make admissions against herself of things that never occurred in connection with the execution of the contract, strongly tend to support her version of the transaction, and weaken those of the other side.

### Request for Secrecy.

Complainant avers in her bill that her brother enjoined upon her the importance of secrecy as to what they were doing, and she makes the same statement in her deposition. This charge is denied by the appellant in his deposition, while in his answer on the same subject he says:

"Respondent denies the allegation in complainants' bill that he manifested to complainant, Alice Kutzner, any undue concern in respect to having their

business relations kept private. The whole intent and purpose of this respondent while arranging with complainant, Alice Kutzner, for a division between them of the estate inherited from their father, was to carry out and respect his father's wishes. It was a characteristic of Jonathan P. Bowen, well known to all his friends, and particularly to his family, that he never desired the public to have knowledge of his private business, and, when it came to dividing his estate, this respondent felt that the lifelong business method of his father should be respected and followed, and for that reason it was mutually agreed between the complainant, Alice Kutzner, and this respondent, that they would keep private the business pertaining to the division of the estate between them."

This answer in effect admits what the sister charges, though it attempts to show that it was by agreement that privacy was to be observed. The answer concedes that the respondent felt that he was carrying out his father's desires in keeping the matter secret, and since he, and not his sister, as is manifest from the terms of this contract, is interested in so keeping it, he cannot escape the consequences of an effort to prevent being known what was done between them.

### Complainant's Cross-Examination.

Complainant is clear and explicit in her statement that at the time of the execution of this contract she was alone, her brother having his lawyer and friends present; that she was shown no papers; that no discussion of the terms of settlement were had; that all that was done was to read the contract to her, and she admitted signing the same freely. It was especially attempted to establish the defendant's case by her, and these significant questions were asked by the draftsman of the contract, Mr. Rucker:

"X. Q. 7. At the time the contract was signed, do you remember my reading the contract over in full, and after I had read it, in the presence of your brother, the defendant, Harry Bowen, Jenkin Jones, and J. B. Perry, asking you if you understood the terms of the contract, and your reply that you did; and my then asking you if you understood that by this contract you gave to your brother all of your interest in the 125 shares of stock in the Booth-Bowen Coal & Coke Company, and 260 shares of stock in the Norfolk Coal & Coke Company, which belonged to your father at the time of his death, and that you got nothing in exchange for your interest in these stocks, except your brother's undivided one-half interest in the old home place at St. Clair, and your replying that you understood that; and my then asking you if, with this understanding, you were perfectly willing to sign and enter into this contract, to which you replied in the affirmative; do you remember these questions and your reply thereto as I have stated? A. Now, as to the first part, when you read it, when Mr. Rucker read it, he asked me if I understood what he had read, and I said, 'yes.' There was no further explanation, or anything that would give me to understand any more about it. I have no recollection of Mr. Rucker putting questions that would have explained that to me. X. Q. 8. In order that you may have your memory refreshed, I will ask again if you do not remember of my asking you particularly if you understood that your brother was to get all of your father's interest in the Booth-Bowen Coal & Coke Company and the Norfolk Coal & Coke Company, and that the other property should be divided, except the house at St. Clair. A. I do not remember your putting the question. I remember your reading it in the contract."

These questions sought to commit the witness to having admitted in the presence of her brother, his attorney, and his two friends: (a) That she understood the terms of the contract; (b) that she especially understood that by signing it she gave up to her brother all in-

terest in the stock in the two coal companies, belonging to her father at the time of his death; (c) that she was to get nothing in exchange for her interest in these stocks, except her brother's one-half interest in the old home place at St. Clair; (d) and that with such understanding and knowledge she freely entered into and signed the contract. The answers of the witness to these questions are all in the negative. The court cannot fail to take notice of the fact that Mr. Rucker, the attorney asking these questions, neither saw fit to go upon the stand and deny this woman's statements, or establish the truth of what he asked her as to her alleged admissions; and the further fact, when he came to examine the subscribing witnesses to the contract, that he did not ask such questions of them as would have established his, and not Mrs. Kutzner's, account of what he claimed occurred at the time of the execution of the contract, as embodied in questions 7 and 8 above. The witness Jones was asked whether the contract was explained to the complainant, and this question was withdrawn, and a less leading and more general one asked; to which he responded that he heard Mr. Rucker read the contract, and ask her if she understood it, to which she replied in the affirmative; and of the witness Perry, only a general question was asked, as follows:

"Q. 13. You have stated that the said contract between Harry Bowen and Alice Kutzner was read to Mrs. Kutzner by Edgar P. Rucker before Mrs. Kutzner signed said contract. Please state what, if anything, was said or done by Mr. Rucker in connection with the reading of said contract to Mrs. Kutzner. Ans. In a general way, I would say that the contract was read over by Mr. Rucker, and the various objects or statements set forth therein were explained to Mrs. Kutzner."

But upon cross-examination he says that he means by "explanation" "that certain property went to her, and certain other property went to Mr. Bowen." The complainant has never disputed that; she at the time supposed she understood the contract. The question was whether she knew what she was doing, 'the nature and effect of her act, and was not induced thereto by any fraud or undue influence; in other words, whether she acted with full information in and about the matters under consideration; whether those upon whom she had a right to rely did not abuse her confidence, mislead her, and fail to exercise towards her the providence, protection, and care which, from their situation and relation with respect to her, they were bound to exercise in her behalf. She thought that her brother was to receive the coal stocks, upon terms and conditions stated by him to her, as to caring for her, and as to which she supposed he had obligated himself, and that she would share with him certain of the other property. The questions indicated above are not such as would have been asked this witness, nor would there have been a failure to produce Rucker as a witness, if any such explanation was made as is set forth in the seventh question of her cross-examination. The asking of such a question, and the failure to follow it up, is apparent, and is entitled to much significance in reaching a conclusion as to what occurred at the time of the execution of the contract.

Parties having the relation the appellant does to the appellee, holding the favored position as to knowledge, experience, and peculiar

acquaintance with the property involved, and receiving the disproportional, great, and unnatural advantage secured under the agreement sought to be annulled, cannot afford to hold anything back, and least of all can he, even when cross-examining his sister as a witness, place her in a false position, or attempt to entrap or catch her in any unfair manner. He should under such circumstances show high conduct and clean hands, and remove so far as he could from the transaction any possible doubt or question, and he should have prevented, instead of attempting to catch or inveigle her into making admissions against herself.

One occupying such position to his sister, and securing from her such advantages in dealing with her father's estate, cannot enjoin secrecy, or avoid the consequences of an effort so to do, by placing the same upon the otherwise high grounds of observing the wishes of his deceased parent. When in the absence of a will, or of a word of any sort in writing of a testamentary character, and without a single witness other than himself, he is seeking to secure from his sister virtually one-half of an estate worth over $250,000, upon the alleged ground that his father intended him to have it, he must hide nothing, but remove doubt, and allay suspicion, otherwise so unnatural a thing, something so unknown to the law, and out of keeping with what is the general experience of mankind, ought not, and should not, be sanctioned.

## The Stock Transfer.

Coming now to the effect of the transfer of stock of the Norfolk Coal & Coke Company, alleged to have been made to the appellant by his father in his lifetime, and which it is claimed the appellant had no knowledge of at the time of entering into the contract aforesaid with his sister, or indeed until after the 28th of July, 1905, when it developed in the taking of testimony on her behalf, and which assignment he claims the benefit of, and attempts to set up in this case by his amended answer of the 16th of January, 1906, the filing of which complainant excepted to, and the court overruled, and allowed the answer to be filed. There was much force in the exception, as it is highly improbable, considering the business connections existing between appellant and the officers of the company in which the stock was held and by whom it was transferred, the amount involved, and the connection he necessarily had with the property, that appellant could have remained in ignorance from September, 1902, until July, 1905, of the fact of the gift and the transfer, had he exercised any diligence whatever regarding the same. Nor does there appear to be any good reason why, under the circumstances of this case, a delay of six months should have occurred after the alleged discovery before the filing of his amended answer. McKay v. McKay, 33 W. Va. 736, 11 S. E. 213; Foutty v. Poar, 35 W. Va. 72, 12 S. E. 1096; Daniel's Chan. Prac. vol. 1, p. 777; Beach, Modern Equity, § 414; Bates, Federal Procedure, vol. 1, § 343 et seq.; Barton's Chan. Prac. vol. 1, p. 420.

The facts regarding this transaction as developed in the record are briefly: That Jonathan P. Bowen in his lifetime, to wit, on the 3d of January, 1898, being the owner of 3 certificates of stock in the Nor-

folk Coal & Coke Company, Nos. 402, 403, and 404, aggregating 260 shares, indorsed the assignment on the back of each of the certificates in blank, and left them with the Bank of Bramwell as collateral security for loans with the bank. The certificates had printed on the back the usual form of power of attorney, as follows:

"For value received —— have bargained, sold, assigned and transferred, and by these presents do bargain, sell, assign and transfer unto —— the stock named in the within certificate, and do hereby constitute and appoint ————————— true and lawful attorney irrevocable for —— and in —— name and stead, but to —— use, to sell, assign, transfer and set over all or any part of the said stock and for that purpose to make and execute all necessary acts of assignment and transfer, any one or more persons to substitute with like full power. Dated —————————. Signed and acknowledged in presence of —————————."

These powers of attorney thus in blank had the signatures attached of J. P. Bowen and J. B. Perry, the latter the cashier of the bank, as attesting witness. The certificates remained in the custody of the cashier of the bank until the debt was paid off, some time in the fall of 1902, the date not given, when they were delivered by him to Isaac T. Mann, secretary and treasurer of the Norfolk Coal & Coke Company, who was also vice president of the Bank of Bramwell. From this time these certificates appear from this record to have been lost sight of until upon the examination of J. Walter Graybeal, secretary and treasurer of the Pocahontas Consolidated Company, of which the Norfolk Coal & Coke Company was a constituent company, on the 28th of July, 1905, the witness testified, upon being asked as to the number of shares Jonathan P. Bowen owned in the Norfolk Coal & Coke Company at the time of his death, that:

"The stock certificates were transferred from J. P. Bowen to Harry Bowen September 26, 1902, and were transferred on the books of the Norfolk Coal & Coke Company on December 16, 1902."

Not until after this deposition did even the appellant claim to know of this transfer, and complainant, of course, knew nothing of such transaction, as the stock was in the contract between her brother and herself as a part of her father's estate, and so treated in subsequent proceedings in this case. It now appears that the blank power of attorney on each of these certificates as signed by J. P. Bowen, and filed at the bank, had been filled up as of the 26th day of September, 1902, the name of Harry Bowen inserted therein as transferee, Isaac T. Mann's name as attorney in fact, and the necessary words of "I," "me," and "my" also filled in to complete the power of attorney. In two of these certificates, the name of J. P. Bowen appears to have been erased by one ink line drawn through each of the same, and one with two ink lines. Isaac T. Mann appears to have filled up these certificates, and as he claims, on the 26th of September, 1902, which was 14 days before the death of Jonathan P. Bowen; and subsequent to his death, on the 16th of December, 1902, he also appears to have caused a new certificate of stock to issue by the Norfolk Coal & Coke Company, in the name of Harry Bowen, for 260 shares of stock. This certificate is signed by Isaac T. Mann as secretary, and Jenkin Jones as president, of the company; being the same Jenkin Jones that witnessed the contract between

the complainant and her brother, treating this stock as belonging to the estate of J. P. Bowen, and giving it to her brother. Isaac T. Mann testified that he was secretary of and a director in the Norfolk Coal & Coke Company, and vice president of the bank of Bramwell, and was familiar with the signatures of J. P. Bowen and J. B. Perry, and that all the writing in the powers of attorney on the back of the certificates wherein he was named as attorney in fact, and the certificates made over to Harry Bowen, other than the signatures of J. P. Bowen and J. B. Perry, was in his handwriting; and in answer to the question at whose instance he did this writing, and for what purpose, he replied, "I believe the assignments as made by me were at the instance of J. P. Bowen, and it was for the purpose of transferring the stock to Harry Bowen"; and then, after explaining that the certificates were deposited as collateral with the bank, and the fact of their cancellation by the Fidelity Trust Company, on December 22, 1902, explained that the latter company were acting as transfer agents for the Norfolk Coal & Coke Company, and that it was customary, after preparing these certificates, to deliver to the trust company both the old certificates for cancellation, and the new certificate for registration, and that it was the duty of the trust company to cancel the old certificates before returning the same; and that therefore the cancellation made by the trust company was the usual cancellation, and that he was reasonably sure that such was the course pursued in this case, though he could not say positively without examining his books; that such new certificate would have been in the name of Harry Bowen. The witness further testified that he believed that the pen marks through the signature of J. P. Bowen on the original certificates of stock were made by him, but he was not positive, after the certificates had been returned by the transfer agent, saying that the transfer agent would hardly have made the transfer if the signatures had been canceled before he executed the new certificate; and, again, that it was rather a habit of his, after certificates had been canceled, to run his pen through the signatures. He was not, however, willing to give any special reason why this was done in this case, more than that it was customary for his company to forward the old certificates along with the new without cancellation; and he made no explanation of the fact of why it would not be proper for him, upon issuing the new certificates, as the representative of the Norfolk Coal & Coke Company, to have made such cancellation before sending both certificates with the power of attorney to the transfer company. The witness further testified that the date written on the back of the certificate, 26th of September, 1902, was the date the assignment was filled up by him; and to the inquiry of whether J. P. Bowen was present at the time, he replied:

"I do not recollect whether Mr. J. P. Bowen was present, but I do not believe I would have made the transfer unless in his presence, or by authority by him."

And to a further inquiry as to whether Mr. Perry was present or not, he answered:

"I am not able to state that Mr. Perry was present at the time the transfer was filled out, 26th September, 1902."

And to the inquiry whether there was a difference in the ink, particularly that used on certificate No. 404, and whether or not said assignments were not filled up at different times, he replied:

"I believe that the same ink was used in writing the assignments as was used in the dates, and I believe all of the writing made on the back of these certificates by me was made the same day."

He was then asked:

"Q. 22. State, if you can, where you were when Mr. J. P. Bowen directed you to fill up the assignments on the three certificates mentioned. A. I do not recollect. Q. 24. Was it at the Bank of Bramwell? A. I do not remember."

The witness then testified that the transfer company returned the certificates of stock to him, the originals as well as the new No. 436, in favor of Harry Bowen for 260 shares, which latter certificate he said was issued by him as secretary of the Norfolk Coal & Coke Company on the 16th December, 1902, and transferred by the transfer company on the 22d of December, 1902; that he properly recorded the three canceled certificates in the stock certificate book, but did not remember to whom certificate No. 436 was delivered; that it was returned to him along with the others by the transfer company, and he thereupon filed as a part of his deposition certificate No. 436.

Assuming this pretended transfer of stock to have been bona fide made, and otherwise legally and properly executed, there seems never to have been any delivery of the stock, which would have been necessary to make effectual the gift of the same. The specific question to whom Mr. Isaac T. Mann, who apparently was engaged in making this transfer, delivered the certificate, was not put to Mr. Mann, and it was an all-important one to those seeking to establish the validity of such a gift; and its consequence cannot be avoided by his statement that he did not remember to whom it was delivered. It does not follow that it was delivered to any one. On the contrary, the irresistible inference from Mr. Mann's testimony is that it was never delivered, and it could not have been until it was issued on the 16th of December, 1902, more than 60 days after the death of Jonathan P. Bowen. Nor is there the slightest suggestion that the original certificates of stock with the assignments on the back thereof, either while they were in blank, or after they had been filled up by Isaac T. Mann, were ever delivered to Harry Bowen. Indeed, from this record it does not appear that the donor, Jonathan P. Bowen, was ever in possession of these certificates of stock after their deposit with the bank as collateral some five years previously, and the evidence of Harry Bowen himself precludes the idea of any delivery to him, as he says he knew nothing of the alleged assignments until after the 28th day of July, 1905. Gifts inter vivos of personal property, to be effective, must be accompanied by the delivery of the possession, the donor parting with all present and future dominion over it; the donor must be divested of, and the donee invested with, the right of property in the subject of the gift; it must be absolute, irrevocable, without any reference to its taking effect at some future time; and without such proof, clear and explicit, the gift fails. No mere promise or declaration of intention to give will suffice, however

clearly the same may be established. Nothing short of a complete and unconditional delivery is sufficient to constitute a valid gift, and, until delivery, the gift is inchoate and revocable. Authority to support this position is abundant, and reference will only be had to a few of the decisions of the federal courts, and of the states of Virginia and West Virginia. Basket v. Hassell, 107 U. S. 602, 2 Sup. Ct. 415, 27 L. Ed. 500; Wright v. Bragg, 106 Fed. 25, 45 C. C. A. 204; Dickeschied v. Bank, 28 W. Va. 340, 359; Ewing v. Ewing, 2 Leigh (Va.) 337; Yancy v. Field. 65 Va. 756, 8 S. E. 721; Thomas, Adm'r, v. Lewis et al., 89 Va. 1, 15 S. E. 389, 18 L. R. A. 170, 37 Am. St. Rep. 848. In this case grave doubt exists as well of the making of the gift as of the delivery of the property.

This transaction as to the alleged transfer of stock, whereby Jonathan P. Bowen is alleged to have parted with property worth $150,000, is a most unusual one, and may be said to be shrouded from beginning to end in mystery and doubt. Had it ever been the purpose of Jonathan P. Bowen to part with more than half of his estate, and make a gift thereof to his son, it is hard to believe, considering the business relations between the father and the son, that the latter would not have known about it, and still more improbable that the father would have sought to perfect such a gift by a verbal direction to some one to fill up the blank powers of attorney upon certificates of stock that had been deposited in bank in blank some five years before; that there should have been no witness to such an occurrence, and the party in whom the trust was reposed of making the transfer of property of such magnitude should have been so little impressed by it that he does not know when or where it occurred, whether at the bank or not, nor indeed does he positively swear that it ever happened at all. The information that we are vouchsafed on this subject by the witness Mann is:

"I believe the assignments as made by me were at the instance of Mr. J. P. Bowen, and it was for the purpose of transferring the stock to Harry Bowen."

And he further states, in answer to the question of whether J. P. Bowen was present at the time he filled up the alleged assignment, that:

"I do not recollect as to whether Mr. J. P. Bowen was present, but I do not believe I would have made the transfer unless in his presence or by authority by him."

It will be observed in the last answer that the witness not only does not pretend that he was present, but clearly indicates that he would not have considered it necessary to have him present if he had his authority; and it is monstrous to suppose that a transaction of this size and unusual character would not have so impressed itself upon this witness that he would have been able to give us the minutest details of what occurred. Isaac T. Mann is not an ordinary witness; he was the secretary and a director of a great coal company, and vice president of the Bank of Bramwell; and it will not do for him within a period of four years to be uncertain as to such an important occurrence as the filling up of blank powers of attorney left with his bank, and the purpose for which had ended, thereby transferring from the estate of an

old man, within two weeks of his death, an amount of the size here, and constituting more than half of his estate. The fact that the death of Jonathan P. Bowen followed so quickly after this occurrence, and that this witness was engaged in consummating the transaction six weeks after his death, should have so impressed itself upon his mind that the smallest details thereof would never have faded from his memory; and it is incredible to suppose that he would have done all this without communicating what had occurred to the appellant, Harry Bowen, his business associate and friend, and with whom, as this record shows, he was in constant contact; and it is highly improbable that what occurred at Mr. Mann's bank at the time of the assignment of this stock, within 20 days of the death of Jonathan P. Bowen, when said Bowen and his sister were contracting about the stock, and Jenkin Jones and J. B. Perry acted as witnesses to the contract between the parties—said Jones being president of the Norfolk Coal & Coke Company, who subsequently signed the new certificate of stock now in question to Harry Bowen, and J. B. Perry a witness to the original certificate of stock held by the father—that something would not have occurred or taken place that would have developed the alleged transfer of the stock by the father in his lifetime to his son. Moreover, it is significant in this connection that, when appellant wrote for his sister to come to his home shortly after his father's death, it was, as she says, and which is not denied, that he wrote her that Mr. Mann wanted to see her on a matter of business, and that it would be necessary for her to be there in person. She did, after arranging by telegraphic communication for a delay of a week, make the trip, but nothing further, so far as appears from this record, seems to have come of Mr. Mann's wanting to see her. That he should have seen her, no one can doubt, with a power of attorney from her father in his possession claimed to have been filled up only 14 days before the father's death, giving to the brother more than one-half of an estate worth some $250,000, and which power of attorney he had not acted upon or carried out. Ought he not in good conscience and fair dealing to have advised her of the transaction, and at least informed her of what he was going to do or felt it his duty to do under the power, after the death of her father, and thereby afforded her an opportunity to contest such a transaction if she wanted to?

The date, 26th of September, 1902, when it is claimed the assignments on the stock certificates were filled up, was important, and the status of the indebtedness of Jonathan P. Bowen with the Bank of Bramwell at that time was important, and would have thrown at least some light on when it was that this important transfer of property was made; but we are not favored with this information. Perry, one of the attesting witnesses to the contract, on the 25th of November, 1902, was also cashier of the bank, and he says the custodian of these certificates of stock of Jonathan P. Bowen until the loans were discharged, the exact date of which he says he cannot give, but that it was some time in the fall of 1902. That is very indefinite language—"some time in the fall of 1902." The books of the bank should have shown when this indebtedness for which these certificates were deposited as collateral was discharged, and at least it could have been as-

certained whether it was before or after the 26th of September, 1902, when it is explained the certificates were filled up. September was the first fall month. Jonathan P. Bowen was living but 14 days thereafter, and just when it was that these certificates passed from the bank to Isaac T. Mann, the secretary of the Norfolk Coal & Coke Company, as is claimed, and why they should have been so delivered to him, instead of to Jonathan P. Bowen, who was their owner, and had deposited them with the bank in blank as collateral, is all-important to know; as it is why, after the said Mann received them, and after it is alleged in the lifetime of Jonathan P. Bowen, on the 26th of September, 1902, he transferred them to Harry Bowen, he, Mann, should have delayed having the transaction consummated by making the transfer to Harry Bowen for more than two months after the death of his father. These, one and all, are circumstances of suspicion surrounding this transaction, which stamp it with disapproval. Too many unusual things occurred. We are asked to infer too much; namely, that a bank would have delivered $150,000 of certificates held by it as collateral to a party, to whom they did not belong, when it had served its purpose with the bank; that such person would have used these papers for the purpose of transferring the stock; that he would not have known the full and correct name of his own son, and used it in a transaction of such importance and magnitude. That the son would have had or acquired no knowledge thereof even for nearly three years thereafter, when he claims that he accidentally acquired the information a day or two after the 28th day of July, 1905, when an inspection of the original of this new certificate issued in his favor, filed with the deposition of Mr. Mann, shows that he had actually used the same by signing the transfer on the back thereof as early as May 5, 1904, and this transfer appears to be to the same Isaac T. Mann, and one Jenkin E. Jones, under a stockholders' agreement of the 29th of June, 1904, nearly two months after the date of the assignment, and of what stockholders does not appear. This blank power of attorney is witnessed by the same J. B. Perry. Nor can sight be lost of the fact of the failure of W. H. Bowen to explain what, if anything, he did to have this stock properly transferred to himself under his contract with his sister, or his failure to explain anything with respect to the receipt of dividends on this stock, and by what authority he received the same, if he got them. He did not know of the Mann assignment, he says, until July 28, 1905, and an application to transfer the stock under his title thereto from his sister would have elicited that the stock was already his, and such transfer to him should have been made to entitle him to the dividends; and it is hard to believe that he would either have failed to collect the dividends for so long a period, or have omitted promptly to have the transfer made to him under the agreement with his sister.

The whole transaction respecting this transfer of stock is but a companion of the contract entered into between the brother and sister heretofore fully considered, and is entitled to less weight and consideration because of the many circumstances of doubt, improbability, and suspicion which surround it; and the same, as well as the said contract, should be vacated, annulled, and set aside as fraudulent and void, and the said appellees awarded their full half interest in the

estate of which Jonathan P. Bowen died seised and possessed, as though neither of said papers had ever existed, together with the accumulations and profits arising therefrom, and incident thereto, in whosesoever hands the same may be.

In conclusion, it must be borne in mind in this case that the appellant is apparently claiming this property in three different ways, each inconsistent with the other: First, if he, and not his father, bought the stock, then it is his, and does not belong to his father's estate; secondly, his claim under the assignment of the Norfolk Coal & Coke Company stock, alleged to have been made a few days before the death of his father, is inconsistent alike with his individual ownership of it, or of his father's; thirdly, the effort to secure under the contract with his sister the entire coal stock as part of his father's estate is utterly at variance with either of the other contentions. He must maintain his right to this stock, and thereby secure, as against his sister, the great bulk of his father's estate, upon some one, and not all three, of these contentions; and, as neither of the three are supported by any such evidence as he must produce to place him in the favored position that he apparently desires to occupy, all three should be denied. The devolution of estates left by deceased persons to those to whom they rightfully belong under statutes of descents and distributions cannot and will not be avoided by any such varying, uncertain, and inconsistent efforts so to do as is attempted in this case. Especially is this true where the effect of the effort would be to deprive a sister, in the interest of a brother, of her share of the estate under such circumstances as are attempted here. Brothers and sisters occupy a peculiarly delicate relation one to the other, when they come to a division of their ancestor's estate. They are usually fresh from the scene of affliction and sorrow; some of them not infrequently are for the first time called on to act for themselves, and admonished of their personal and individual responsibility in meeting the grave and serious affairs of life. This was strikingly true in this case; the female complainant had been raised as a poor girl; her father was a laboring man, and never until he had long passed the meridian of life had he been able to accumulate any property of consequence, and not then until he had removed some 500 miles away to another state, where he quickly accumulated a large fortune. His daughter remained at the old homestead, and the son accompanied his father, and became his business associate. The father died, and the daughter was summoned within less than a month to come to her brother's home, with a view of settling the estate's affairs. He knew everything as to the condition of the property jointly theirs; she in effect nothing. And she was thus called upon by him, while staying at his house, away from her home and husband, amid the scenes and surroundings in which her father had spent the declining and prosperous years of his eventful life, and with his death then fresh and vivid in her memory; and, naturally deeply affected and saddened by the memories that such environments would likely produce, she was but too easily amenable to any suggestion that appeared to her to be carrying out the wishes of her dead parent, and that she thus felt is only evidence of the higher motives and instincts that ac-

..ated her.  She had the right implicitly to rely upon her brother; she had been bereft of her father, upon whom she had so long been accustomed to lean; and her elder and only brother for the first time had been called upon and placed in the position of assuming the head of the family, and, to her, taking the place made vacant by the death of her father; and that he should have met this new relation in fact and truth, and not in mere form, goes without saying.  Whatever occurred, he should have seen with scrupulous care that full justice was done to his confiding sister, and least of all should he have allowed himself to receive any unfair advantage over her in the division of her father's property; nor should he have received or accepted from her anything without giving to her the fullest possible information, and allowing her to act only after taking independent counsel and advice as to what she should do.  How far short the brother on this occasion failed in his duty is only too apparent by what has heretofore been stated herein, and its manifest coldness, indifference, and almost cruel consequences need not be again recited, further than to say that what he did personally, and allowed others to do in his behalf, does not commend him to the consideration of a court of equity.  It would be an evil day in the administration of justice, were the courts of the country to countenance such conduct on the part of a brother, and to sanction a policy that would give effect to a transaction such as is sought to be enforced in this case between those occupying the relationship that the parties here bear the one to the other.

The decree of the lower court is plainly right in all respects, and is affirmed, with costs.

Affirmed.