## Wytheville.

GEORGE R. NUGENT v. THOMAS NUGENT, ET ALS.

June 18, 1931.

Present, Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Darr, Darr & Espey* and *Gardner L. Boothe,* for the appellant.

*Carl Budwesky,* for the appellees.

HOLT, J., delivered the opinion of the court.

George R. Nugent, plaintiff, is sixty-one years old and a night watchman at the National Museum in the city of Washington. He was at one time in the army and was in service in the Philippines during the insurrection there. After that tour of duty was completed he returned to this country and went to his mother's home in Alexandria, where he lived until her death in 1907. He then went to the home of his brother, Thomas W. Nugent, and remained there as a boarder until 1925, when he moved over to Washington. In 1928 he was married. His wife survives.

There are three brothers still living. Thomas, one of them, a defendant here, has a home in Alexandria, but works in Washington in the Bureau of Engraving.

From the plaintiff's evidence it appears that on February 20, 1930, Thomas 'phoned him to come over as he wished to see him. In answer to this he went over the next day and took dinner there. At that time he owned twenty shares of stock in the Citizens National Bank of Alexandria, evidenced by two stock certificates, then in a safety deposit box at that institution. On the occasion of that visit Thomas suggested that he come back to Alexandria and live with him and at the same time importuned him to turn over to him this bank stock, say-

ing: "You can turn over your stock to me temporarily and I will give it to you when you want it." Yielding to this persuasion, they went together to the bank and explained to Mr. Pierce, its president, the purpose of their visit. The stock certificates were taken out of George's box and assigned over to Thomas.

Upon his return home he thought over what had been done. Realizing its unwisdom, he came back next day, February 22nd, and begged that this stock be reassigned to him. This the brother refused to do. On the next day, February 23rd, he went to see Mr. Pierce to advise with him about the situation in which he found himself, but Mr. Pierce was not in his office. On the next day, February 24th, he went again to the bank and consulted one of its officials, Mr. Downham. That night he again saw his brother and again besought him in vain to turn back the stock. After this second refusal he placed the case in the hands of his lawyer, who, by registered letter, on February 25th, wrote, making a like demand. This letter was not answered. On March 6th, Mrs. Thomas Nugent ordered Mr. Pierce to sell. His evidence is: "She left an order for it to be sold that day, and to get as much for it as I could." It was sold under the pressure of this order and brought $410.00 a share. Before then, sales at $450.00 a share had been made, and shortly thereafter some of it sold for $437.50 a share. It thus appears that the gross price realized was $8,200.00, and that its actual value was somewhere between that sum and $9,000.00. In addition to this stock, plaintiff, at the time of its transfer, owned certain evidences of debt, worth about $4,500.00.

The defendant, his wife and daughter have testified. The substance of their evidence is that George revealed to them that his married life was unhappy; that his wife was nagging him and wanted to have all of his property put in her name. They say that he had upon many former occasions reiterated his purpose to give this stock to his brother, to whom he is

greatly attached, and that, in addition to these sentiments of attachment, was actuated by the desire to put his house in order that he might get a divorce. They on their part advised him not to take such action, but to live with his wife and to stand to his bargain. They further say that they do not believe that he really wants this stock back at all, and, in explanation of his request for its return, say that his wife was making life miserable for him on account of what had been done.

In all of this, as might have been expected, there is irreconcilable conflict.

Neighbors of the plaintiff, who had opportunities of observation, testify that plaintiff's married life seems to be normal and happy.

Mr. Pierce said that when this stock transfer took place he saw nothing unusual about the transaction and nothing to excite his suspicion.

Whatever may be the truth about controverted matters, this much is plain: The plaintiff is in failing health; he is married with a dependent wife, and has given to a brother, hale and not dependent, over $8,000.00, or two-thirds of his personal estate. A request for its return was made immediately after the gift, but was refused. Soon thereafter the defendants ordered the stock to be sold forthwith, and it was so sold at a sacrifice.

About fifteen years ago George Nugent had a nervous breakdown and went to a sanitarium in Battle Creek, Michigan, where he remained for about three months, after which, on the advice of Dr. Hicklin, he went to Takoma Park Sanatorium.

Dr. Hicklin is a physician living in Washington and is a graduate of the medical school of Georgetown University, who specializes in mental and nervous diseases, and who was called to testify as an expert. His evidence is that he first examined the plaintiff in 1920 and found him suffering from maniac depressive insanity. He saw him later in February, 1930, somewhere around the twenty-seventh, and has seen him on seven or eight occasions since. At the February examina-

tion he said he was then suffering from a recurrence of this mental disorder. He testified also that the situation of this plaintiff mentally was not of recent development. This the court struck out. It did permit this witness to testify as to the patient's incapacity on February 27th, but refused to let him say that his condition had existed for some time and probably for more than a month.

Dr. Moore was also introduced as an expert in mental and nervous diseases. He specializes in those disorders and has a clinic in Providence Hospital in Washington. He is a graduate of Georgetown University and was a student at Munich. From his evidence it appears that George Nugent consulted him in March, 1929.

His diagnosis was also maniac depressive insanity. In April, 1930, he re-examined him and found marked mental deterioration, his judgment being that he then had the mind of a child about nine years old.

For the purpose of putting objections to the rejection of certain testimony in proper form, Dr. Hicklin was asked:

"Q. Doctor, from your examination of the patient in this case and from the testimony of the patient, which you have heard this morning, is it your opinion, as an expert of mental and nervous diseases, that the plaintiff was in a condition on February 21, 1930, to have transacted any important business matter?"

An objection to this question was sustained, whereupon counsel said to the court:

"The object of this question is to obtain from Dr. Hicklin the statement that, in his opinion as an expert on mental and nervous diseases, that the plaintiff was not in a condition on the twenty-first day of February to transact any important business."

Had the witness been permitted to answer he would have said:

"I would have so answered with the qualification that he

didn't know, and wasn't in the mental condition at that time to know, the nature and consequences of his act."

Dr. Moore was then asked for the purpose of putting the rejected evidence in the record:

"Q. Dr. Moore, from your examination of the patient in this case and from the testimony of the patient, which you have heard this morning, is it your opinion, as an expert on mental and nervous diseases, that the plaintiff was in a condition on February 21, 1930, to have transacted any important business matter?

"He was not capable."

■ The admissibility of this evidence is not seriously questioned. Ordinarily, present insanity is no evidence that such a disorder had existed for years, but there are unnumbered cases which could not have commenced on yesterday. Certainly an expert who examines a patient a week after some particular transaction should be permitted to say that he was then insane and labored under a type of insanity which must have antedated that incident.

■ The court below, after rejecting this testimony, in its opinion, which is part of the record, said:

"The court, in arriving at the conclusion herein stated, has given full consideration to the answers of each of these doctors as to their opinion regarding the mental condition of the complainant on the twenty-first day of February, 1930, which answers were given for the purpose of preserving same in the record after questions seeking such answers had been objected to and the objections were sustained."

It is not easy to say how a court could give due consideration to evidence not admitted, for the situation here is not that in which an error committed in the exclusion of testimony is made harmless by its later admission. Moreover, counsel had a right to argue as to the weight which should be given to it by the trial court, and this privilege was of course denied.

Dr. McCarthy was the family physician and attended him

in July, August and September, 1929. He found the patient restless, unable to sleep, depressed and worried, "and always on the verge of tears," and this is the substance of the neighbors' evidence. Mr. Hunsinger is an assistant instructor in chemistry at Georgetown University. He boarded in George Nugent's home and said that "he was very nervous and inclined to shed tears and couldn't sleep. I thought it was just a nervous breakdown." And again: "Around February I noticed he was practically incompetent. His eyes gave no notice of intelligence at all. He seemed to be very low in mind."

For the past sixteen months he had been able to work less than half of his time, although his work was extremely light. He has been treated at the Walter Reed Hospital.

We think that error was committed in the rejection of evidence heretofore noted. The facts before us are sufficient to enable this court to enter final judgment, and this it is our duty to do. Code, section 6365.

We are not dealing with the interest of creditors, and the interest of no third party is directly involved. A man may make a gift to his brother and such an act is ordinarily no badge of fraud, or of undue influence, but the transaction itself may be so unusual and so counter to common experience as to establish them beyond peradventure. Direct evidence is not necessary and is not always at hand. Those things done in themselves frequently furnish conclusive proof. *Todd* v. *Sykes,* 97 Va. 143, 33 S. E. 517; *Crowder* v. *Crowder,* 125 Va. 80, 99 S. E. 746; *Long* v. *Harrison,* 134 Va. 424, 114 S. E. 656; *Sanderson* v. *Bell,* 154 Va. 415, 153 S. E. 651; *Allore* v. *Jewell,* 94 U. S. 506, 24 L. Ed. 260.

A plaintiff's testimony is not usually sufficient in itself to establish fraud denied by a defendant not less interested. Here we have a married man, past middle life, nervous, sick and broken, unable to work, with the mind of a nine-year-old child, who, for no reason at all, suddenly gives to a brother, who is not dependent, two-thirds of his modest estate. A

prompt request for its return was refused and when suit appeared possible, this donee proceeded at once to convert this stock into money, at a loss, when there was no occasion to sell at all.

If this gift had been the result of a purpose long entertained, there would have been no immediate request for its return, and we are not impressed with the defendant's statement to the effect that such a request was not made in good faith but to satisfy a nagging wife. The cause of *Fishburne and Wife* v. *Ferguson's Heirs*, 84 Va. 87, 4 S. E. 575, 582, is quite apposite. In that case a voluntary gift was set aside. There Lewis, P., in discussing Lord Hardwick's classification of fraud in *Chesterfield* v. *Jansen*, 2 Ves. 155, said that it might be presumed from the circumstances and conditions of the parties and need not always be proven, and that this presumption was at times necessary to prevent advantage being taken of the weakness or necessities of another. He further said:

"The present case comes under the third of these heads, for, although it is true that courts will not undertake to measure the size of people's understandings or capacities, and, therefore, mental weakness alone will not invalidate an instrument (*Greer* v. *Greers*, 9 Gratt. [50 Va.] 330), yet where, as we have seen, great weakness of mind concurs with gross inadequacy of consideration, or circumstances of suspicion, the transaction will be presumed to have been brought about by undue influence and will be set aside."

All of this applies to the case in judgment.

For reasons stated, the decree appealed from must be reversed. The stock itself was sold on March 6, 1930, for $8,200.00. Ordinarily, the measure of plaintiff's recovery would be that sum with interest from the day of sale, but there was no occasion to sell it at that time. The sale was a forced one, and the price realized by reason thereof was somewhat under its actual value. In these circumstances, we think that the most that these defendants can ask is that they be required

to pay back to the plaintiff $8,200.00, with interest from February 22, 1930, the day upon which a return of this stock was demanded, and a decree to that effect should be entered under Code, section 6365—that is to say, George R. Nugent is entitled to and must have entered in his favor a decree for $8,200.00, with interest from February 22, 1930, against the defendants, Thomas Nugent and Mary Nugent, and it is so ordered.

*Reversed.*